**Smith; Xavier-jamal**

# INVOICE

Attorney-in-fact for **XAVIER JAMAL SMITH**

c/o 1499 MLK DRIVE., STE 64527

GARY, IN 46401

INVOICE: 0011

DATE: 03/20/2024

T0:

Credit Acceptance Corporation

135 North Pennsylvania Street., Suite 1610

Indianapolis, IN 46204

FOR:

Services and Damages

| DESCRIPTION | HOURS | RATE PER HOUR | AMOUNT |
|---|---|---|---|
| Studying | 112 | 5,000 | 560,000 |
| Studying while under duress | 236 | 10,000 | 2,360,000 |
| Analyzing | 104 | 5,000 | 520,000 |
| Analyzing while under duress | 227 | 10,000 | 2,270,000 |
| Preparing Documents | 96 | 5,000 | 480,000 |
| Preparing Documents while under duress | 125 | 10,000 | 1,250,000 |
| Violation of Rights Per 18 USC 1344 | | | 1,000,000 |
| Violation of Rights Per 18 USC 1951 | | | 1,000,000 |
| Violation of Rights Per 12 USC 504 12 USC 411 12USC 412 | | | 49,775,000 |
| | | | |

TOTAL        59,215,000

**Make all checks payable to Xavier Jamal Smith**

**Total due within 15 days of case ruling.**



**Smith; Xavier-jamal / Agent / Attorney-in-fact
for XAVIER JAMAL SMITH / Principal**

# litigation fee schedule

### 1. Studying:

- Regular Rate: $5,000 per hour

- Rate under threat, duress, and coercion: $10,000 per hour

### 2. Analyzing:

- Regular Rate: $5,000 per hour

- Rate under threat, duress, and coercion: $10,000 per hour

### 3. Research:

- Regular Rate: $5,000 per hour

- Rate under threat, duress, and coercion: $10,000 per hour

### 4. Preparing Documents:

- Regular Rate: $5,000 per hour

- Rate under threat, duress, and coercion: $10,000 per hour

### 5. Providing information:

- Regular Rate: $5,000 per hour

- Rate under threat, duress, and coercion: $10,000 per hour

1 of 2

**6. Court Appearances:**

  - Regular Rate: $5,000 per hour

  - Rate under threat, duress, and coercion: $10,000 per hour

It is important to note that these rates are subject to negotiation and may vary depending on the complexity and nature of the case, as well as the experience and expertise of the attorney or legal professional providing the services.

**Payment Terms:**

- All fees are stated in lawful money.

- Payment is due within 15 days of the case ruling or settlement.

Thank You,

By: _Smith, Xavier-jamal_

Smith, Xavier-jamal,
Attorney-in-Fact, for
XAVIER JAMAL SMITH
Done in good faith.

---

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

LAKE COUNTY
STATE OF INDIANA, ss:

On 1/11/2024 before me Rene A. Long, personal appeared XAVIER JAMAL SMITH, who proved to be on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing paragraph odd true and correct.
Witness my hand and official seal.

_Renae A. Long_

**Signature of Notary Public**                    **(Notary Seal)**

NOTARY PUBLIC SEAL INDIANA

Renae A Long
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700731
My Commission Expires May 22, 2025

2 of 2

# EXHIBIT "A"

Federal Reserve Act

Section 16. Note Issues

1. Issuance of Federal Reserve notes; nature of obligation; where redeemable

Federal reserve notes, to be issued at the discretion of the Board of Governors of the Federal Reserve System for the purpose of making advances to Federal reserve banks through the Federal reserve agents as hereinafter set forth and for no other purpose, are hereby authorized. The said notes shall be obligations of the United States and shall be receivable by all national and member banks and Federal reserve banks and for all taxes, customs, and other public dues. They shall be redeemed in lawful money on demand at the Treasury Department of the United States, in the city of Washington, District of Columbia, or at any Federal Reserve bank.

[12 USC 411. As amended by act of Jan. 30, 1934 (48 Stat. 337). For redemption of Federal reserve notes whose bank of issue cannot be identified, see act of June 13, 1933.]

2. Application for notes by Federal Reserve banks

Any Federal Reserve bank may make application to the local Federal Reserve agent for such amount of the Federal Reserve notes hereinbefore provided for as it may require. Such application shall be accompanied with a tender to the local Federal Reserve agent of collateral in amount equal to the sum of the Federal Reserve notes thus applied for and issued pursuant to such application. The collateral security thus offered shall be notes, drafts, bills of exchange, or acceptances acquired under section 10A, 10B, 13, or 13A of this Act, or bills of exchange endorsed by a member bank of any Federal Reserve district and purchased under the provisions of section 14 of this Act, or bankers' acceptances purchased under the provisions of said section 14, or gold certificates, or Special Drawing Right certificates, or any obligations which are direct obligations of, or are fully guaranteed as to principal and interest by, the United States or any agency thereof, or assets that Federal Reserve banks may purchase or hold under section 14 of this Act or any other asset of a Federal reserve bank. In no event shall such collateral security be less than the amount of Federal Reserve notes applied for. The Federal Reserve agent shall each day notify the Board of Governors of the Federal Reserve System of all issues and withdrawals of Federal Reserve notes to and by the Federal Reserve bank to which he is accredited. The said Board of Governors of the Federal Reserve System may at any time call upon a Federal Reserve bank for additional security to protect the Federal Reserve notes issued to it. Collateral shall not be required for Federal Reserve notes which are held in the vaults of, or are otherwise held by or on behalf of, Federal Reserve banks.

[12 USC 412. As amended by the acts of Sept. 7, 1916 (39 Stat. 754); June 21, 1917 (40 Stat. 236); Feb. 27, 1932 (47 Stat. 57); Feb. 3, 1933 (47 Stat. 794); Jan. 30, 1934 (48 Stat. 338); March 6, 1934 (48 Stat. 991); June 30, 1941 (55 Stat. 395); May 25, 1943 (57 Stat. 85); June 12, 1945 (59 Stat. 237); June 19, 1968 (82 Stat. 189); Nov. 10, 1978 (92 Stat. 3672); March 31, 1980 (94 Stat. 140); Dec. 6, 1999 (113 Stat. 1638); and Oct. 28, 2003 (117 Stat. 1193).]

1 of 6

3. Distinctive letter on notes; destruction of unfit notes

Federal Reserve notes shall bear upon their faces a distinctive letter and serial number which shall be assigned by the Board of Governors of the Federal Reserve System to each Federal Reserve bank. Federal Reserve notes unfit for circulation shall be canceled, destroyed, and accounted for under procedures prescribed and at locations designated by the Secretary of the Treasury. Upon destruction of such notes, credit with respect thereto shall be apportioned among the twelve Federal Reserve banks as determined by the Board of Governors of the Federal Reserve System.

[12 USC 413. As amended by acts of June 21, 1917 (40 Stat. 236); Jan. 30, 1934 (48 Stat. 338); June 12, 1945 (59 Stat. 237); July 19, 1954 (68 Stat. 495); March 3, 1965 (79 Stat. 5); May 20, 1966 (80 Stat. 161); and March 18, 1968 (82 Stat. 50).]

4. Granting right to issue notes

The Board of Governors of the Federal Reserve System shall have the right, acting through the Federal Reserve agent, to grant in whole or in part, or to reject entirely the application of any Federal Reserve bank for Federal Reserve notes; but to the extent that such application may be granted the Board of Governors of the Federal Reserve System shall, through its local Federal Reserve agent, supply Federal Reserve notes to the banks so applying, and such bank shall be charged with the amount of the notes issued to it and shall pay such rate of interest as may be established by the Board of Governors of the Federal Reserve System on only that amount of such notes which equals the total amount of its outstanding Federal Reserve notes less the amount of gold certificates held by the Federal Reserve agent as collateral security. Federal Reserve notes issued to any such bank shall, upon delivery, together with such notes of such Federal Reserve bank as may be issued under section 18 of this Act upon security of United States 2 per centum Government bonds, become a first and paramount lien on all the assets of such bank.

[12 USC 414. As amended by acts of June 21, 1917 (40 Stat. 237); Jan. 30, 1934 (48 Stat. 338); June 12, 1945 (59 Stat. 237); and March 18, 1968 (82 Stat. 50).]

5. Deposit to reduce liability for outstanding notes

Any Federal Reserve bank may at any time reduce its liability for outstanding Federal Reserve notes by depositing with the Federal Reserve agent its Federal Reserve notes, gold certificates, Special Drawing Right certificates, or lawful money of the United States. Federal Reserve notes so deposited shall not be reissued, except upon compliance with the conditions of an original issue. The liability of a Federal Reserve bank with respect to its outstanding Federal Reserve notes shall be reduced by any amount paid by such bank to the Secretary of the Treasury under section 4 of the Old Series Currency Adjustment Act.

[12 USC 415. As reenacted by act of June 21, 1917 (40 Stat. 237); and as amended by acts of Jan. 30, 1934 (48 Stat. 339); June 30, 1961 (75 Stat. 147); March 18, 1968 (82 Stat. 50); and June 19, 1968 (82 Stat. 189). The act of June 30, 1961, is the Old Series Currency Adjustment Act.]

6. Substitution of collateral; retirement of Federal Reserve notes

Any Federal reserve bank may at its discretion withdraw collateral deposited with the local Federal reserve agent for the protection of its Federal reserve notes issued to it and shall at the same time substitute therefor other collateral of equal amount with the approval of the Federal reserve agent under regulations to be prescribed by the Board of Governors of the Federal Reserve System. Any Federal reserve bank may retire any of its Federal reserve notes by depositing them with the Federal reserve agent or with the Treasurer of the United States, and such Federal reserve bank shall thereupon be entitled to receive back the collateral deposited with the Federal reserve agent for the security of such notes. Any Federal Reserve bank shall further be entitled to receive back the collateral deposited with the Federal Reserve agent for the security of any notes with respect to which such bank has made payment to the Secretary of the Treasury under section 4 of the Old Series Currency Adjustment Act. Federal reserve notes so deposited shall not be reissued except upon compliance with the conditions of an original issue.

[12 USC 416. As amended by acts of June 21, 1917 (40 Stat. 237); June 30, 1961 (75 Stat. 147); and March 18, 1968 (82 Stat. 50). The act of June 30, 1961 is the Old Series Currency Adjustment Act.]

7. Custody of reserve notes, gold certificates, and lawful money

All Federal Reserve notes and all gold certificates, Special Drawing Right certificates, and lawful money issued to or deposited with any Federal Reserve agent under the provisions of the Federal Reserve Act shall hereafter be held for such agent, under such rules and regulations as the Board of Governors of the Federal Reserve System may prescribe, in the joint custody of himself and the Federal Reserve bank to which he is accredited. Such agent and such Federal Reserve bank shall be jointly liable for the safekeeping of such Federal Reserve notes, gold certificates, Special Drawing Right certificates, and lawful money. Nothing herein contained, however, shall be construed to prohibit a Federal Reserve agent from depositing gold certificates and Special Drawing Right certificates with the Board of Governors of the Federal Reserve System, to be held by such Board subject to his order, or with the Treasurer of the United States for the purposes authorized by law.

[12 USC 417. As added by act of June 21, 1917 (40 Stat. 238); and amended by acts of Jan. 30, 1934 (48 Stat. 339) and June 19, 1968 (82 Stat. 189).]

8. Engraving of plates; denominations and form of notes

In order to furnish suitable notes for circulation as Federal reserve notes, the Secretary of the Treasury shall cause plates and dies to be engraved in the best manner to guard against counterfeits and fraudulent alterations, and shall have printed therefrom and numbered such quantities of such notes of the denominations of $1, $2, $5, $10, $20, $50, $100, $500, $1,000 $5,000, $10,000 as may be required to supply the Federal reserve banks. Such notes shall be in form and tenor as directed by the Secretary of the Treasury under the provisions of this Act and shall bear the distinctive numbers of the several Federal reserve banks through which they are issued.

3 of 6

[12 USC 418. As amended by acts of Sept. 26, 1918 (40 Stat. 970); June 4, 1963 (77 Stat. 54); and Sept. 23, 1994 (108 Stat. 2293).]

9. Custody of unissued notes

When such notes have been prepared, the notes shall be delivered to the Board of Governors of the Federal Reserve System subject to the order of the Secretary of the Treasury for the delivery of such notes in accordance with this Act.

[12 USC 419. As amended by acts of May 29, 1920 (41 Stat. 654) and Sept. 23, 1994 (108 Stat. 2293).]

10. Custody of plates and dies; expenses of issue and retirement of notes

The plates and dies to be procured by the Secretary of the Treasury for the printing of such circulating notes shall remain under his control and direction, and the expenses necessarily incurred in executing the laws relating to the procuring of such notes, and all other expenses incidental to their issue and retirement, shall be paid by the Federal reserve banks, and the Board of Governors of the Federal Reserve System shall include in its estimate of expenses levied against the Federal reserve banks a sufficient amount to cover the expenses herein provided for.

[12 USC 420. Part of original Federal Reserve Act; not amended.]

11. Examinations of plates, dies, etc.

The Secretary of the Treasury may examine the plates, dies, bed pieces, and other material used in the printing of Federal Reserve notes and issue regulations relating to such examinations.

[12 USC 421. As amended by act of Sept. 23, 1994 (108 Stat. 2293).]

12. Appropriation for engraving, etc.

Any appropriation heretofore made out of the general funds of the Treasury for engraving plates and dies, the purchase of distinctive paper, or to cover any other expense in connection with the printing of national-bank notes or notes provided for by the Act of May thirtieth, nineteen hundred and eight, and any distinctive paper that may be on hand at the time of the passage of this Act may be used in the discretion of the Secretary for the purposes of this Act, and should the appropriations heretofore made be insufficient to meet the requirements of this Act in addition to circulating notes provided for by existing law, the Secretary is hereby authorized to use so much of any funds in the Treasury not otherwise appropriated for the purpose of furnishing the notes aforesaid: *Provided, however,* That nothing in this section contained shall be construed as exempting national banks or Federal reserve banks from their liability to reimburse the United States for any expenses incurred in printing and issuing circulating notes.

[Omitted from U.S. Code. Part of original Federal Reserve Act. This paragraph was in effect amended by subsection (a) of section 1 of the Permanent Appropriation Repeal Act of 1934, approved June 26, 1934 (48 Stat. 1224; 31 USC. 725), which provides: "That effective July 1, 1935, such portions of any acts as provide permanent or

continuing appropriations from the general fund of the Treasury to be disbursed under the appropriation accounts appearing on the books of the Government, and listed in subsection (b) of this section, are hereby repealed, and any unobligated balances under such accounts as of June 30, 1935, shall be covered into the surplus fund of the Treasury." Among the appropriation accounts listed in subsection (b) is that for the preparation and issue of Federal Reserve notes.]

13. Checks and drafts to be received on deposit at par

Every Federal reserve bank shall receive on deposit at par from depository institutions or from Federal reserve banks checks and other items, including negotiable orders of withdrawal and share drafts and drafts drawn upon any of its depositors, and when remitted by a Federal reserve bank, checks and other items, including negotiable orders of withdrawal and share drafts and drafts drawn by any depositor in any other Federal reserve bank or depository institution upon funds to the credit of said depositor in said reserve bank or depository institution. Nothing herein contained shall be construed as prohibiting a depository institution from charging its actual expense incurred in collecting and remitting funds, or for exchange sold to its patrons. The Board of Governors of the Federal Reserve System shall, by rule, fix the charges to be collected by the depository institutions from its patrons whose checks and other items, including negotiable orders of withdrawal and share drafts are cleared through the Federal reserve bank and the charge which may be imposed for the service of clearing or collection rendered by the Federal reserve bank.

[12 USC 360. As amended by act of March 31, 1980 (94 Stat. 140).]

14. Transfer of funds among Federal Reserve banks

The Board of Governors of the Federal Reserve System shall make and promulgate from time to time regulations governing the transfer of funds and charges therefor among Federal reserve banks and their branches, and may at its discretion exercise the functions of a clearing house for such Federal reserve banks, or may designate a Federal reserve bank to exercise such functions, and may also require each such bank to exercise the functions of a clearing house for depository institutions.

[12 USC 248-1. As amended by acts of Aug. 23, 1935 (49 Stat. 704) and March 31, 1980 (94 Stat. 140). Reclassified (previously 12 USC 248(o).]

15. Settlement fund

The Secretary of the Treasury is hereby authorized and directed to receive deposits of gold or of gold certificates or of Special Drawing Right certificates with the Treasurer or any Assistant Treasurer of the United States when tendered by any Federal Reserve bank or Federal Reserve agent for credit to its or his account with the Board of Governors of the Federal Reserve System. The Secretary shall prescribe by regulation the form of receipt to be issued by the Treasurer or Assistant Treasurer to the Federal Reserve bank or Federal Reserve agent making the deposit, and a duplicate of such receipt shall be delivered to the Board of Governors of the Federal Reserve System by the Treasurer at Washington upon proper advices from any Assistant Treasurer that such deposit has been made. Deposits so made shall be held subject to the orders of

5 of 6

the Board of Governors of the Federal Reserve System and deposits of gold or gold certificates shall be payable in gold certificates, and deposits of Special Drawing Right certificates shall be payable in Special Drawing Right certificates, on the order of the Board of Governors of the Federal Reserve System to any Federal Reserve bank or Federal Reserve agent at the Treasury or at the subtreasury of the United States nearest the place of business of such Federal Reserve bank or such Federal Reserve agent. The order used by the Board of Governors of the Federal Reserve System in making such payments shall be signed by the chairman or vice chairman, or such other officers or members as the Board may by regulation prescribe. The form of such order shall be approved by the Secretary of the Treasury.

[12 USC 467. As added by act of June 21, 1917 (40 Stat. 238); and amended by acts of Jan. 30, 1934 (48 Stat. 339) and June 19, 1968 (82 Stat. 189). Prior to enactment of the Banking Act of 1935, approved Aug. 23, 1935, the chairman and vice chairman of the Board of Governors of the Federal Reserve System were known as the governor and vice governor of the Federal Reserve Board, respectively. See note to section 1.]

16. Expenses

The expenses necessarily incurred in carrying out these provisions, including the cost of the certificates or receipts issued for deposits received, and all expenses incident to the handling of such deposits shall be paid by the Board of Governors of the Federal Reserve System and included in its assessments against the several Federal reserve banks.

[12 USC 467. As added by act of June 21, 1917 (40 Stat. 238).]

17. Preservation of provisions of Act of March 14, 1900

Nothing in this section shall be construed as amending section six of the Act of March fourteenth, nineteen hundred, as amended by the Acts of March fourth, nineteen hundred and seven, March second, nineteen hundred and eleven, and June twelfth, nineteen hundred and sixteen, nor shall the provisions of this section be construed to apply to the deposits made or to the receipts or certificates issued under those Acts.

[12 USC 467. As added by act of June 21, 1917 (40 Stat. 239).]

6 of 6

# EXHIBIT "B"

Federal Reserve Act

Section 29. Civil Money Penalty

**(a) First Tier.** Any member bank which, and any institution-affiliated party (within the meaning of section 3(u) of the Federal Deposit Insurance Act) with respect to such member bank who, violates any provision of section 22, 23A, or 23B, or any regulation issued pursuant thereto, shall forfeit and pay a civil penalty of not more than $5,000 for each day during which such violation continues.

[12 USC 504(a). As added by act of Nov. 10, 1978 (92 Stat. 3641) and amended by acts of Oct. 15, 1982 (96 Stat. 1523) and Aug. 9, 1989 (103 Stat. 470).]

**(b) Second Tier.** Notwithstanding subsection (a), any member bank which, and any institution-affiliated party (within the meaning of section 3(u) of the Federal Deposit Insurance Act) with respect to such member bank who

1.
   A. commits any violation described in subsection (a);
   B. recklessly engages in an unsafe or unsound practice in conducting the affairs of such member bank; or
   C. breaches any fiduciary duty;
2. which violation, practice, or breach--
   A. is part of a pattern of misconduct;
   B. causes or is likely to cause more than a minimal loss to such member bank; or
   C. results in pecuniary gain or other benefit to such party,

shall forfeit and pay a civil penalty of not more than $25,000 for each day during which such violation, practice, or breach continues.

[12 USC 504(b). As added by act of Nov. 10, 1978 (92 Stat. 3641) and amended by act of Aug. 9, 1989 (103 Stat. 470).]

**(c) Third Tier.** Notwithstanding subsections (a) and (b), any member bank which, and any institution-affiliated party (within the meaning of section 3(u) of the Federal Deposit Insurance Act) with respect to such member bank who--

1. knowingly--
   A. commits any violation described in subsection (a);
   B. engages in any unsafe or unsound practice in conducting the affairs of such credit union; or
   C. breaches any fiduciary duty; and
2. knowingly or recklessly causes a substantial loss to such credit union or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice, or breach,

shall forfeit and pay a civil penalty in an amount not to exceed the applicable maximum amount determined under subsection (d) for each day during which such violation, practice, or breach continues.

[12 USC 504(c). As added by act of Nov. 10, 1978 (72 Stat. 3641) and amended by act of Aug. 9, 1989 (103 Stat. 470).]

1 の 3

**(d) Maximum Amounts Of Penalties For Any Violation Described In Subsection (c).** The maximum daily amount of any civil penalty which may be assessed pursuant to subsection (c) for any violation, practice, or breach described in such subsection is--

1.   in the case of any person other than a member bank, an amount to not exceed $1,000,000; and
2.   in the case of a member bank, an amount not to exceed the lesser of --
       A.   $1,000,000; or
       B.   1 percent of the total assets of such member bank.

[12 USC 504(d). As added by act of Nov. 10, 1978 (92 Stat. 3641) and amended by acts of Oct. 15, 1982 (96 Stat. 1523) and Aug. 9, 1989 (103 Stat. 470).]

**(e) Assessment, Etc.** Any penalty imposed under subsection (a), (b), or (c) shall be assessed and collected by

1.   in the case of a national bank, by the Comptroller of the Currency; and
2.   in the case of a State member bank, by the Board.

in the manner provided in subparagraphs (E), (F), (G), and (I) of section 8(i)(2) of the Federal Deposit Insurance Act for penalties imposed (under such section) and any such assessment shall be subject to the provisions of such section.

[12 USC 504(e). As added by act of Nov. 10, 1978 (92 Stat. 3641) and amended by act of Aug. 9, 1989 (103 Stat. 470).]

**(f) Hearing.** The member bank or other person against whom any penalty is assessed under this section shall be afforded an agency hearing if such member bank or person submits a request for such hearing within 20 days after the issuance of the notice of assessment. Section 8(h) of the Federal Deposit Insurance Act shall apply to any proceeding under this section.

[12 USC 504(f). As added by act of Nov. 10, 1978 (92 Stat. 3641) and amended by act of Aug. 9, 1989 (103 Stat. 470).]

**(g) Disbursement.** All penalties collected under authority of this paragraph shall be deposited into the Treasury.

[12 USC 504(g). As added by act of Nov. 10, 1978 (92 Stat. 3641) and amended by act of Aug. 9, 1989 (103 Stat. 470).]

**(h) Violate Defined.** For purposes of this section, the term "violate" includes any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.

[12 USC 504(h). As added by act of Aug. 9, 1989 (103 Stat. 470).]

**(i) Regulations.** The Comptroller of the Currency and the Board shall prescribe regulations establishing such procedures as may be necessary to carry out this section.

[12 USC 504(i). As added by act of Aug. 9, 1989 (103 Stat. 470).]

**(m)* Notice Under This Section After Separation From Service.** The resignation, termination of employment or participation, or separation of an institution-affiliated party

(within the meaning of section 3(u) of the Federal Deposit Insurance Act) with respect to a member bank (including a separation caused by the closing of such a bank) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice and proceed under this section against any such party, if such notice is served before the end of the 6-year period beginning on the date such party ceased to be such a party with respect to such bank (whether such date occurs before, on, or after the date of the enactment of this subsection).

[12 USC 504(m). As added by act of Aug. 9, 1989 (103 Stat. 461).]

* So in original. Subsection (m) was added without subsections (j) through (*l*).

3 of 3

# EXHIBIT "C"

# credit acceptance

25505 West Twelve Mile Rd
Southfield, Michigan 48034-1846
Phone 800-634-1506
www.creditacceptance.com

October 31, 2023

Xavier Smith
1499 Martin Luther King Dr Unit 64527
Gary IN 46401-7024

RE: #98785263, 2016 Chevrolet Camaro, 1G1FB1RS0G0171297

Dear Xavier Smith:

This letter is in response to your recent account status request and/or payoff quote request. Please note that some of the information below may have changed if charges or credits were recently applied to your account.

| Contract Date: | 05/13/2020 | Account Balance: | $38,686.65 |
| Account Maturity Date: | 11/13/2025 | Next Payment Amount Due: | $24,731.37 |
| Standard Payment Amount: | $581.47 | Next Payment Due Date: | 06/13/2020 |
| Last Payment Made Date: | 07/09/2021 | | |

Payoff Information:

- The Payoff Amount owed on the Account is $36,065.07 which is good through 11/29/2023. If the Payoff Amount is not received by November 29, 2023, additional amounts may be owed, and it will be necessary for you to contact us to obtain an updated Payoff Amount.

- The Payoff Amount includes the following, if applicable:

| Guaranteed Asset Protection Rebate | $0.00 |
| Vehicle Service Contract Rebate | $0.00 |
| Finance Charge Rebate | $2,639.08 |
| Total Rebate | $2,639.08 |
| Future Late Charge (included when payoff is received after November 29, 2023) | $17.50 |
| Net Rebate = Total Rebate − Future Late Charge | $2,621.58 |
| Interest Accrued through November 29, 2023 | $0.00 |

- Your Account Balance may be different than the Payoff Amount. The Payoff Amount may be higher than your Account Balance if interest is accruing from the date of this letter to November 29, 2023. The Payoff Amount may be lower than the Account Balance if you are paying off a pre-computed account before the Maturity Date. Please refer to your contract for more details on early payoff of the Account

- The Payoff Amount is not inclusive of fees or other charges (other than any Future Late Charge itemized above) that may apply to the Account prior to our receipt of the Payoff Amount.

See Reverse Side for Additional Information

IONCRAC011250-561366523

PO Box 513
Southfield MI 48037-0513
ADDRESS SERVICE REQUESTED

ACCEPTED FOR DEPOSIT

$38,686.65

October 31, 2023

CREDIT ACCEPTANCE CORPORATION
25505 West Twelve Mile Road
Southfield MI 48034-1846

Xavier Smith
1499 Martin Luther King Dr Unit 64527
Gary IN 46401-7024

Thirty-eight thousand, six-hundred and eighty-six dollars

PAY TO ORDER OF BEARER

PAYABLE ON DEMAND

UNITED STATES TREASURY
Fiscal Agent of the United States, for redemption or in exchange for securities of a new issue, in accordance with written instructions submitted by

For presentation to the

- Please allow up to twenty (20) days after our receipt of your payment, unless a shorter period is required by law, to receive your title and lien release documents. Payments submitted with guaranteed funds will expedite the lien and title release process. If you require an expedited lien release, please pay with a money order or certified check. Please include the Account number with your payment.

**Guaranteed Asset Protection (GAP) and Vehicle Service Contract (VSC) Rebate Information:**

The disclosures below indicate whether the Payoff Amount includes any available rebates for the anticipated cancellation of GAP and/or a VSC. Only the disclosures which are checked apply. If there is no GAP and/or VSC on the Account, the disclosures which indicate that no GAP and/or VSC contract rebates are included are checked. Please also see above the rebate amounts included in the Payoff Amount, as applicable.

☐ The Payoff Amount includes any available rebate for the anticipated cancellation of GAP.

☑ The Payoff Amount does not include any available rebate for the anticipated cancellation of GAP. That may be because you didn't finance GAP or because you financed GAP through a third-party and we are unable to obtain the refund amount at the time of your payoff request. If there is GAP on the account and you would like a payoff amount which includes any available rebate for the anticipated cancellation of GAP, please call 1-800-634-1506.

☐ The Payoff Amount includes any available rebate for the anticipated cancellation of the VSC. If we haven't previously been given permission to cancel the VSC and you still wish to cancel, please call us to cancel the VSC prior to submitting payment. If the actual mileage at the time the VSC is canceled is different than the mileage provided in connection with requesting this Payoff Amount, it could change the Payoff Amount, which could result in the account not being paid in full and the title or lien release not being sent.

☑ The Payoff Amount does not include any available rebate for cancellation of the VSC. That may be because you didn't finance VSC or because you financed VSC through a third party and we are unable to obtain the refund amount at the time of your payoff request. If there is a VSC on the account and you would like a Payoff Amount which includes any available rebate for the anticipated cancellation of the VSC, please contact us at 1-800-634-1506.

Credit Acceptance offers a wide range of payment options to make it quick and easy for you to make your payment. For a complete list of our payment options, simply go to www.creditacceptance.com and select "Make A Payment."

If you have any questions, please contact us at 1-800-634-1506.

Thank you,
Credit Acceptance

# EXHIBIT "D"



## Notice of Default and Opportunity to Cure

I, Smith; Xavier-jamal/agent, on behalf of XAVIER JAMAL SMITH/principal, hereby accept all titles, rights, interest, and equity owed to XAVIER JAMAL SMITH/principal. I hereby instruct the Chief Financial Officer of *Credit Acceptance , Jay D. Martin*, and all assigns and successors, to apply the principal's balance to the principal's account #*98785263* for set-off. It was also my intent to instruct the Chief Financial Officer of *Credit Acceptance , Jay D. Martin*, and all assigns and successors, to release the lien immediately. And per my intent, I instruct the said Chief Financial Officer, and all assigns and successors, to release the lien immediately, and send a certified copy of the release via certified mail to this address:

XAVIER JAMAL SMITH
1499 MLK DR., STE 64527
GARY, IN 46401

I also instruct the said Chief Financial Officer, and all assigns and successors, to communicate in writing within five (5) business days once instructions are completed.
If instructions are not completed, I instruct the said Chief Financial Officer, and all assigns and successors, to respond in writing within five (5) business days giving reason for non-performance of fiduciary duties. If no communication is made within five (5) business days I, Smith; Xavier-jamal/agent, on behalf of XAVIER JAMAL SMITH/principal can assume that instructions have been completed.

Thank You,

By: _____
Smith; Xavier-jamal,
Attorney-in-Fact, for
XAVIER JAMAL SMITH
Done in good faith.

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

LAKE COUNTY
STATE OF INDIANA, ss:
On _Nov.13, 2023_ before me _Renae a Long_, personal appeared XAVIER JAMAL SMITH, who proved to be on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing paragraph odd true and correct.
Witness my hand and official seal.

_____ (Notary Seal)
Signature of Notary Public

**Renae A Long**
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700731
My Commission Expires May 22, 2025

# EXHIBIT "E"

# COVER SHEET

**RECORDING REQUEST BY:**
Xavier-jamal ; Smith

**AND WHEN RECORDED MAIL TO**
Name: Xavier jamal Smith
Address:1499 MLK DRIVE
STE 64527
GARY, IN 46401

GINA PIMENTEL
RECORDER
STATE OF INDIANA
LAKE COUNTY
RECORDED AS PRESENTED

**2023-034573**
3:34 PM    2023 Dec 18

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## RECORDATION OF PUBLIC NOTICE

### TABLE OF CONTENT

1. Durable Power of Attorney for "XAVIER JAMAL SMITH"

**Purpose of the Full Faith and Credit Clause:**

Specifically Article IV, Section 1, of the U.S. Constitution states: "Full faith and credit shall be given in each state to the PUBLIC RECORDS_ every other state..." The goals of the Framers of the Constitution in the Full Faith and Credit Clause was to unite the new born country while allowing the states to retain some autonomy.... US Supreme court decision in Milwaukee County v. M. E. White Co., reaffirmed the intent to make states "integral parts of a single nation," in which a judgment is to be enforced, no matter its state of origin.

**Compliance with:**

U.S.C. 18 Sec 2076; I.c. 5-14-3-1; I.c. 5-14-3-2; Indiana Public Records 1.1, 1.2, 1-3; Act of
March9, 1933; Senate Report 93-549; Public Law 94-112;The Act of June 551933; Congressional Record, March 9, 1933 on HR 1491 p.83; Senate Document No. 43, 73rd CONGRESS attached by reference.





1 . 0 0



# DURABLE POWER OF ATTORNEY

## <u>Notice to Person Executing Durable Power of Attorney</u>

A durable power of attorney is an important legal document. By signing the durable power of attorney, you are authorizing another person to act for you, the principal. Before you sign this durable power of attorney, you should know these important facts:

Your agent (attorney-in-fact) has no duty to act unless you and your agent agree otherwise in writing. This document gives your agent the powers to manage, dispose of, sell, and convey your real and personal property, and to use your property as security if your agent borrows money on your behalf. This document does not give your agent the power to accept or receive any of your property, in trust or otherwise, as a gift, unless you specifically authorize the agent to accept or receive a gift.

Your agent will have the right to receive reasonable payment for services provided under this durable power of attorney, unless you provide otherwise in this power of attorney.

The powers you give your agent will continue to exist for your entire lifetime, unless you state that the durable power of attorney will last for a shorter period of time or unless you otherwise terminate the durable power of attorney. The powers you give your agent in this durable power of attorney will continue to exist even if you can no longer make your own decisions respecting the management of your property.

You can amend or change this durable power of attorney only by executing a new durable power of attorney or by executing an amendment through the same formalities as an original. You have the right to revoke or terminate this durable power of attorney at any time, so long as you are competent.

This durable power of attorney must be dated and must be acknowledged before a notary public or attested to by 2 witnesses. A durable power of attorney that may affect real property should be acknowledged before a notary public so that it may easily be recorded.

You should read this durable power of attorney carefully. When effective, this durable power of attorney will give your agent the right to deal with property that you now have or might acquire in the future. The durable power of attorney is important to you. If you do not understand the durable power of attorney, or any provision of it, then you should obtain the assistance of an attorney or other qualified person.

2 of 9

NOTICE: THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD AND SWEEPING.THEY ARE EXPLAINED IN "CREATION OF A POWER OF ATTORNEY" INDIANA CODE (IC 30-5-4) AND "VALIDITY OF POWER; CONDITIONS" INDIANA CODE (IC 30-5-4-1). IF YOU HAVE ANY QUESTIONS ABOUT THESE POWERS, OBTAIN COMPETENT LEGAL ADVICE. THIS DOCUMENT DOES NOT AUTHORIZE ANYONE TO MAKE MEDICAL AND OTHER HEALTH CARE DECISIONS FOR YOU. YOU MAY REVOKE THIS POWER OF ATTORNEY IF YOU LATER WISH TO DO SO.

.I, XAVIER JAMAL SMITH, residing at 1499 MLK DR., GARY, IN 46401, telephone number (219) 613-7758, and email address is info@xavier-jamal-smith-estate-trust.com, appoint Smith; Xavier-jamal of c/o 1499 Martin Luther King Drive., Gary, Indiana [46401] , telephone number (219) 613-7758, and email address LamajxeL@gmail.com, as my agent(attorney-in-fact) to act for me in any lawful way with respect to the following initialed subjects.

This Power of Attorney shall not be affected by my subsequent incapacity.

All acts done by the Agent pursuant to a durable power of attorney during the principal's incapacity have the same effect, power, authority, and inure to the benefit of and bind the principal and the principal's successors in interest as if the principal had capacity. This power shall authorize my Agent to manage my affairs and to exercise all of my legal rights, including rights and powers acquired in the future. My Agent's authorized, but not limited to, exercise the power to:

(INITIAL each subject you want to include in the agent's general authority.)

XJS  Real estate transactions

XJS  Tangible personal property transactions

XJS  Stock and bond transactions

XJS  Commodity and option transactions

XJS  Banking and other financial institution transactions

XJS  Business operating transactions

XJS  Insurance and annuity transactions

XJS  Estate, Trust, and other Beneficiary Transactions

XJS  Claims and Litigation

XJS  Personal and Family Maintenance

XJS  Benefits from social security Medicare, Medicaid, or other Governmental

Programs or Civil or Military Service

3 of 9

XJS  Retirement benefit transactions

XJS  Tax matters

I hereby revoke or terminate any and all general powers of attorney and special powers of attorney that previously have been signed by me.

SPECIAL INSTRUCTIONS APPLICABLE TO AGENT COMPENSATION: My agent is entitled to reasonable compensation for services rendered to the principal and to reimbursement for reasonable expenses incurred as a result of acting as agent.

# GRANT OF SPECIFIC AUTHORITY

My agent MAY NOT do any of the following specific acts for me UNLESS I have INITIALED the specific authority listed below:

(CAUTION: Granting any of the following will give your agent the authority to take actions that could significantly reduce your property or change how your property is distributed at your death. Consultation with an attorney is recommended before granting any of these specific powers).

XJS  Create, amend, revoke, or terminate an inter vivos trust
XJS  Make a gift subject to the limitations under federal law and any Special Instructions under this Power of Attorney

XJS  Create or change rights of survivorship
XJS  Create or change a beneficiary designation
XJS  Authorize another person to exercise the authority granted under this power of attorney.

XJS  Waive the principal's right to be a beneficiary of a joint and survivor annuity, including a survivor benefit under a retirement plan,
XJS  Access the content of electronic communications
XJS  Exercise fiduciary powers that the principal has authority to delegate,

XJS  Disclaim or refuse an interest in property, including a power of appointment,

This Power of Attorney shall be construed broadly as a General Power of Attorney. The listing of specific powers is not intended to limit or restrict the general powers granted in this Power of Attorney in any manner.

4 of 9

Any power or authority granted to my Agent under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing, (i) my income to be taxable to my Agent,(ii)my assets to be subject to a general power of appointment by my Agent, or(iii)my Agent to have any incidents of ownership with respect to any life insurance policies that I may own on the life of my Agent.

## RESTRICTIONON AGENT'SAUTHORITY

An agent that is not my ancestor, spouse, or descendant MAY NOT use my property to benefit the agent or a person to whom the agent owes an obligation of support unless I have included that authority in the Special Instructions.

## SPECIAL INSTRUCTIONS

ON THE FOLLOWING LINES, YOU MAY GIVE SPECIAL INSTRUCTIONS LIMITING OR EXTENDING THE POWERS GRANTED TO YOUR AGENT:

Do your job well and I'll reward you.

THIS POWER OF ATTORNEY IS NOT AFFECTED BY MY SUBSEQUENT INCAPACITY.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith. However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney. A Successor Agent shall not be liable for acts of a prior Agent.

My Agent is entitled to reasonable payment for services provided under this power of attorney. My Agent is also entitled to reimbursement of all reasonable expenses incurred in acting under this Power of Attorney.

My Agent shall provide an accounting for all funds handled, and all acts performed at any time upon my request or the request of any authorized personal representative, fiduciary, or court of record acting on my behalf. If so requested, within 30days the agent shall comply with the request or provide a writing or other record substantiating why additional time is needed and shall comply with the request within an additional 30 days.

This Power of Attorney shall be governed by the laws of the state of Indiana. Moreover, I intend to have this Power of Attorney universally recognized and be admissible to recordation. In case that I become a resident of another jurisdiction, or obtain any form of property interest in another jurisdiction, it remains my intention that the laws of Indiana shall continue to govern over this Power of Attorney to the extent that might be legally possible.

5 of 9

This Power of Attorney takes effect immediately and shall not be affected by my disability or lack of mental competence, except as may be provided otherwise by an applicable state statute. This is a Durable Power of Attorney. This Power of Attorney may be revoked by me at any time by providing written notice to my Agent.

Dated 10ᵗʰ OCTOBER , 2023 , at Gary, Indiana.

XAVIER JAMAL SMITH
**XAVIER JAMAL SMITH**

Witness Signature: _Krysta Shucs_
Name: Krystal L. Shanks
Address: 1032 E. 35th Court Gary, IN 46409
Telephone Number: (219) 315-1066

Witness Signature: _Amaris Maaz Abdullah-Bey_
Name: Amaris Maaz Abdullah Bey
Address: 1499 MLK Drive, Gary, IN 46401
Telephone Number: (219) 689-1545

6 of 9

## <u>Notice to Person Accepting the Appointment as Attorney-in-Fact</u>

By acting or agreeing to act as the agent (attorney-in-fact) under this power of attorney, you assume the fiduciary and other legal responsibilities of an agent. These responsibilities include:

1. The legal duty to act solely in the interest of the principal and to avoid conflicts of interest.

2. The legal duty to keep the principal's property separate and distinct from any other property owned or controlled by you.

You may not transfer the principal's property to yourself without full and adequate consideration or accept a gift of the principal's property unless this power of attorney specifically authorizes you to transfer property to yourself or accept a gift of the principal's property. If you transfer the principal's property to yourself without specific authorization in the power of attorney, you may be prosecuted for fraud and/or embezzlement. If the principal is 65 years of age or older at the time that the property is transferred to you without authority, you may also be prosecuted for elder abuse. In addition to criminal prosecution, you may also be sued in civil court.

I have read the fore going notice and I understand the legal and fiduciary duties that I assume by acting or agreeing to act as the agent(attorney-in-fact)under the terms of this power of attorney

Signed:

Smith; Xavier jamal

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**LAKE COUNTY**
**STATE OF INDIANA, ss:**
On 10-20-2023 before me Renae A. Long, personal appeared XAVIER JAMAL SMITH, who proved to be on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing paragraph odd true and correct.
Witness my hand and official seal.

**Signature of Notary Public**     **(Notary Seal)**

Renae A Long
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700731
My Commission Expires May 22, 2025

7 of 9



## OFFICE OF THE LAKE COUNTY RECORDER

LAKE COUNTY GOVERNMENT CENTER
2293 NORTH MAIN STREET
CROWN POINT, INDIANA 46307

**GINA PIMENTEL**
Recorder

PHONE (219) 755-3730
FAX (219) 648-6094

# DISCLAIMER

## This document has been recorded as presented.
## It may not meet with State of Indiana Recordation Requirements.

1. STAINED DOCUMENT AT TIME OF RECORDING: _____

2. RIPPED OR TORN DOCUMENT AT TIME OF RECORDING: _____

3. PAGE(S) MISSING AT TIME OF RECORDING: _____

4. ATTACHMENTS MISSING AT TIME OF RECORDING: _____

5. DOCUMENT TOO LIGHT AT TIME OF RECORDING: _____

6. DOCUMENT NOT LEGIBLE AT TIME OF RECORDING: _____

7. DOCUMENT TORN DURING PROCESS OF RECORDING:_____

8. DOCUMENT STAINED DURING PROCESS OF RECORDING: _____

9. CUSTOMER INSISTING DOCUMENT BE RECORDED:_____

10. CUSTOMER IS AWARE DOCUMENT WILL BECOME A PUBLIC RECORD:_____

11. OTHER: _____

CUSTOMER INITIALS: _X_S___ DATE: _12_,_18_,_23_

EMPLOYEE INITIALS: _____ DATE: _12_,_18_,_23_

8 of 9



**Gina Pimentel**
**Recorder of Deeds**
**Lake County Indiana**
**2293 North Main Street**
**Crown Point, IN 46307**
**219-755-3730**

# *Certification Letter*

State of Indiana )
              ) SS
County of Lake )

This is to certify that I, Gina Pimentel, Recorder of Deeds of Lake County, Indiana am the custodian of the records of this office, and that the foregoing is a full, true and complete copy of a

## POWER OF ATTORNEY

as recorded as  **2023-034573**        **DECEMBER 18, 2023**

as this said document was present for the recordation when  **REGINA M PIMENTEL**

was Recorder at the time of filing of said document

Dated this    **20**    day of    **December**    ,    **2023**

_____
Deputy Recorder

_____
Regina M. Pimentel, Recorder of Deeds
Lake County Indiana

Form # 0023 Revised 5/2002

9 of 9

# EXHIBIT "F"



## CERTIFICATE OF SERVICE

**Republic of** _Indiana_ )
**Subscribed and Affirmed** )
**County of** _Lake_ )

I, _Renae A. Long_ , the undersigned mailer/server, being of sound mind and under no duress, do hereby certify, attest and affirm that the following facts are true and correct, to wit:

1. That, on the **17th** day of _November_ , 2023, that, on behalf of _XAVIER JAMAL SMITH_ , a human being, the undersigned personally deposited the following documents (listed below) inside the envelope, sealed them and transmitted them via the carrier indicated in the item 2 below, to wit:

| Item # | Description of Document | Number of pages |
|---|---|---|
| 1. | Certificate of Service | 2 |
| 2. | Bill of Exchange / Lawful Money | 1 |
| 3. | Tender of Payment Titled, "Notice of Default with Opportunity to cure" | 1 |
| 4. | Copy of Durable Power of Attorney " | 6 |
| 5. | 18 usc 8; 31 usc 5118; 31 usc 3113; Federal Reserve Act 16 & 29 | 14 |
| 6. | Copy of Previously mail Tender and Payment package info | 1 |
| 7. | Copy of Birth Certificate for XAVIER J. SMITH | 1 |
| 8. | | |
| 9. | | |
| 10. | | |

Total of _7_ documents with combined _26_ pages.

2. That I Personally mailed said document(s) via (initial those which apply):

_____ United States Postal Office, by regular mail, postage prepaid.

1 of 2

_____ United States Postal Office, by priority mail, postage prepaid, tracking Number:_____.

☑ United States Postal Office, by Certified Mail # 7020 3160 0001 9743 0241 .
        Return Receipt Requested.
_____ United Parcell Number Service(UPS), tracking number_____.
_____ Federal Express, tracking number _____.
_____ Other (specify)_____.

At said City and State, One (1) complete set of **ORIGINAL/COPIED (circle one)** documents, as described
in item 1 above, properly enveloped and addressed to (addressee(s) and address(es)).

| # | Recipient(s) and address |
|---|---|
| 1 | Credit Acceptance Corporation-CFO- Jay D. Martin-25505 W. 12 Mile RD |
| 2 | Southfield, MI 48034 |

3. That I am at least 18 years of age;
4. That I am not related to Xavier Jamal Smith _____ by blood, marriage, adoption, or
employment, but serve as a "disinterested third party" (herein known as "server"); and further,
5. That I am in no way connected to, or involved in or with, the person and/or matter at issue in this
instant action.

I now affix my signature to these affirmations.

(Signature) _Renae C. Long_____ , Mailer/Server
(Printed Name): Renae a. Long _____

# NOTARY PUBLIC'S JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed
the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

LAKE COUNTY
STATE OF INDIANA, ss:

On 11/13/23 _____ before me Renae a. Long, personal appeared
Xavier Jamal Smith _____ who proved to be on the basis of satisfactory evidence to
be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to
me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which
the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing
paragraph odd true and correct.

Witness my hand and official seal.
_Renae C. Long_____           (Notary Seal)
**Signature of Notary Public**

SEAL

**Renae A Long**
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700731
My Commission Expires May 22, 2025

2 of 2

# EXHIBIT "G"

Notice of Default

I, Smith; Xavier-jamal/agent, on behalf of XAVIER JAMAL SMITH/principal, hereby accept all titles, rights, interest, and equity owed to XAVIER JAMAL SMITH/principal. I hereby instruct the Chief Financial Officer of Credit Acceptance Corporation, Jay D. Martin and indentured trustee, Computershare Trust Company,N.A. to apply the principal's balance to the principal's account # 98785263 for set-off. It was also my intent to instruct the said Chief Financial Officer, and indentured trustee, to release the lien immediately. And per my intent, I instruct the said Chief Financial Officer and indentured trustee, to release the lien immediately, and send a certified copy of the release via certified mail to this address:

XAVIER JAMAL SMITH
1499 MLK DR., STE 64527
GARY, IN 46401

I also instruct the said Chief Financial Officer, and indentured trustee, to communicate in writing within five (5) business days once instructions are completed. If instructions are not completed, I instruct the said Chief Financial, and indentured trustee, to respond in writing within five (5) business days giving reason for non-performance of fiduciary duties. If no communication is made within five (5) business days I, Smith; Xavier-jamal/agent, on behalf of XAVIER JAMAL SMITH/principal can assume that instructions have been completed.

Thank You,

By: _Smith; Xavier-jamal_

Smith; Xavier-jamal,
Attorney-in-Fact, for
XAVIER JAMAL SMITH
Done in good faith.

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

LAKE COUNTY
STATE OF INDIANA, ss:
On _1|11|2024_____ before me _Renae G. Long_, personal appeared XAVIER JAMAL SMITH, who proved to be on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing paragraph odd true and correct.

Witness my hand and official seal.

_Renae A. Long_          (Notary Seal)
Signature of Notary Public

Renae A Long
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700733
My Commission Expires May 22, 2025

# EXHIBIT "H"



## CERTIFICATE OF SERVICE

Republic of __Indiana__          )
**Subscribed and Affirmed**      )
County of __Lake__               )

I, __Renae a. Long__ , the undersigned mailer/server, being of sound mind and under no duress, do hereby certify, attest and affirm that the following facts are true and correct, to wit:

1. That, on the __11th__ day of __January__ , 20__24__, that, on behalf of XAVIER JAMAL SMITH a human being, the undersigned personally deposited the following documents (listed below) inside the envelope, sealed them and transmitted them via the carrier indicated in the item 2 below, to wit:

| Item # | Document Description | Number of pages |
|---|---|---|
| 1 | Certificate of Service | 2 |
| 2 | Bill of Exchange | 1 |
| 3 | Tender of Payment titled "Notice of Default" | |
| 4 | Certified Copy of Durable Power of Attorney | 9 |
| 5 | Federal Reserve Act Section 16 and 29 | 9 |
| 6 | Copy of Mailed and Delivery receipt from previous tender | 2 |
| 7 | | |

Total of __6__ documents with combined __24__ pages.

2. That I Personally mailed said document(s) via (initial those which apply):

_____United States Postal Office, by regular mail, postage prepaid.

_____United States Postal Office, by priority mail, postage prepaid, tracking Number:_____.

_____United States Postal Office, by Certified Mail #_____
          Return Receipt Requested.
_____United Parcell Number Service(UPS), tracking number_____.
_____Federal Express, tracking number _____
__✓__ Other (specify) __registered mail #__          RE 217 282 796 US

1 of 2

At said City and State, One (1) complete set of **ORIGINAL/COPIED (circle one)** documents, as described in item 1 above, properly enveloped and addressed to (addressee(s) and addres(es))

| # | Recipient(s) |
|---|---|
| 1 | Tracy M. McLamb and or Scott Olmsted, Agent for |
| • | COMPUTER SHARE TRUST COMPANY, N.A  250 Royal St. |
| 3 | Canton, MA 02021 |
| 4 | |
| 5 | |

3. That I am at least 18 years of age;

4. That I am not related to XAVIER JAMAL SMITH by blood, marriage, adoption, or employment, but serve as a "disinterested third party" (herein known as "server"); and further,

5. That I sm in no way connected to, or involved in or with, the person and/or matter atr issue in this instant action.

I now affix my signature to these affirmations.

(Signature) _Renae G. Long_ , Mailer/Server
(Printed Name): _Renae G. Long_

## NOTARY PUBLIC'S JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

LAKE COUNTY
STATE OF INDIANA, ss:

On _1/11/2024_ before me _Renae G. Long_ personal appeared _Xavier Jamal Smith_ who proved to be on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing paragraph odd true and correct.

Witness my hand and official seal.

_Renae G. Long_

**Signature of Notary Public**

(Notary Seal)

**Renae A Long**
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700731
My Commission Expires May 22, 2025

202

# EXHIBIT "I"



# CERTIFICATE OF SERVICE

Republic of _Indiana_        )
**Subscribed and Affirmed**        )
County of _Lake_        )

I, _Renae a. Long_, the undersigned mailer/server, being of sound mind and under no duress, do hereby certify, attest and affirm that the following facts are true and correct, to wit:

1. That, on the _11th_ day of _January_, 20_24_, that, on behalf of _Xavier Jamal Smith_ a human being, the undersigned personally deposited the following documents (listed below) inside the envelope, sealed them and transmitted them via the carrier indicated in the item 2 below, to wit:

| Item # | Document Description | Number of pages |
|---|---|---|
| 1 | Certificate of Service | 2 |
| 2 | Certificate of Service sent to Indenture Trustee | 2 |
| 3 | Copy of Notice of Default sent to Trustee | 1 |
| 4 | Copy of Registered Mail Number sent to Trustee | 1 |
| 5 | | |
| 6 | | |
| 7 | | |

Total of _4_ documents with combined _6_ pages.

2. That I Personally mailed said document(s) via (initial those which apply):

_____United States Postal Office, by regular mail, postage prepaid.

_____ United States Postal Office, by priority mail, postage prepaid, tracking Number:_____.

_____ United States Postal Office, by Certified Mail #_____
          Return Receipt Requested.

_____United Parcell Number Service(UPS), tracking number_____.

_____Federal Express, tracking number _____.

_X_____Other (specify)_Registered Mail #_ RE 217 202796 US
                                          RF 523054120 US

1 of 2

At said City and State, One (1) complete set of **ORIGINAL/COPIED (circle one)** documents, as described in item 1 above, properly enveloped and addressed to (addressee(s) and address(es)).

| # | Recipient(s) |
|---|---|
| 1 | Jay D. Martin CFO - CREDIT ACCEPTANC CORP. |
| 2 | 25505 W. 12 Mile RD. Southfield, MI 48034 |
| 3 | |
| 4 | |
| 5 | |

3. That I am at least 18 years of age;

4. That I am not related to Xavier Jamal Smith by blood, marriage, adoption, or employment, but serve as a "disinterested third party" (herein known as "server"); and further,

5. That I am in no way connected to, or involved in or with, the person and/or matter at issue in this instant action.

I now affix my signature to these affirmations.

(Signature) _Renae A Long_ , Mailer/Server
(Printed Name): _Renae. A Long_

## NOTARY PUBLIC'S JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual(s) who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

LAKE COUNTY
STATE OF INDIANA, ss:

On _1/11/2024_ before me _Renae A. Long_, personal appeared _Xavier Jamal Smith_ who proved to be on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/get/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the lard of the State of Indiana that the foregoing paragraph odd true and correct.

Witness my hand and official seal.

_Renae A Long_ (Notary Seal)
**Signature of Notary Public**

NOTARY PUBLIC SEAL INDIANA

Renae A Long
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 700731
My Commission Expires May 22, 2025

2 of 2

# EXHIBIT "J"

**credit acceptance**

25505 W. 12 Mile Road
Southfield, MI 48034
Customer Service Phone (800) 634-1506

Date: January 25, 2024                    Mail

To:   XAVIER SMITH
      1499 Martin Luther King Dr
      Gary, IN 46401

Re: Credit Acceptance Account Number: 98785263

Dear XAVIER SMITH,

Thank you for reaching out to us with your concerns regarding your account. We have investigated your questions, and I am happy to share our findings.

Thank you for your continued feedback. For your convenience, we've attached copies of Credit Acceptance's 09/28/2023 and 11/22/2023 responses to your prior letters. While we're always willing to assist you with new or different questions about your account, we've already addressed the issues you raised in your most recent letter and have no additional information to provide. For that reason, please understand that you will not receive a response from us if you continue to send us letters raising these same concerns.

We appreciate the opportunity address your concerns. If you have additional questions about your account, please feel free to contact 1-800-634-1506.

Respectfully Yours,

Credit Acceptance

credit
acceptance

25505 W. 12 Mile Road
Southfield, MI 48034
Customer Service Phone (800) 634-1506

Date: November 22, 2023                    Via: MAIL

To:    XAVIER SMITH
       1499 MLK DR UNIT 64527
       GARY, IN 46401

Re: Credit Acceptance Account Number: 98785263

Dear XAVIER SMITH,

       Thank you for reaching out to us with your concerns regarding your account. We have investigated your questions, and I am happy to share our findings.

       I see that you have enclosed documents that you believe entitle you to be released from your Contract. **For the avoidance of any doubt, your account remains open and your contractual obligation to make payments is not discharged.** If you would like to discuss payment arrangements, please call 1-800-634-1506.

       I see that you enclosed payment coupon along with your letter. While we appreciate your efforts to make payments to your account, these documents do not constitute valid forms of payment. You may review all accepted forms of payment at www.creditacceptance.com/make-a-payment. If you have questions or would like to discuss payment arrangements, please call us at 1 (800) 634-1506 and we'll be happy to assist.

       We appreciate the opportunity address your concerns. If you have additional questions about your account, please feel free to contact 1-800-634-1506.


                                   Respectfully Yours,

                                   Credit Acceptance

**credit acceptance**

25505 W. 12 Mile Road
Southfield, MI 48034
Customer Service Phone (800) 634-1506

Date: September 28, 2023          Via: Mail

To:   Xavier Smith
      1499 Martin Luther King Dr.
      Gary, IN 46401

Re: Credit Acceptance Account Number: 98785263

Dear Xavier Smith,

Thank you for reaching out to us with your concerns regarding your account. We have investigated your questions, and I am happy to share our findings.

We have reviewed the allegations in your letter relating to the various statutes you referenced and determined they are inapplicable. We also reviewed the details of your account and found no concerns with the retail installment contract you entered into with Northwest Indiana Auto Finance Inc that was assigned to Credit Acceptance.

You expressed that you believe you have a right to rescind the contract under the Truth in Lending Act ("TILA"). TILA provides consumers with the right to rescind a credit transaction involving a lien on "any property which is used as the principal dwelling of the person to whom credit is extended[.]" 15 U.S.C. § 1635(a). This rescission right is inapplicable to your contract, which you signed to finance a vehicle.

I see that you have enclosed documents that you believe entitle you to be released from your Contract. **For the avoidance of any doubt, your account remains open and your contractual obligation to make payments is not discharged.** If you would like to discuss payment arrangements, please call 1-800-634-1506.

I see that you enclosed a Payment Coupon along with your letter. While we appreciate your efforts to make payments to your account, these documents do not constitute valid forms of payment. You may review all accepted forms of payment at www.creditacceptance.com/make-a-payment. If you have questions or would like to discuss payment arrangements, please call us at 1 (800) 634-1506 and we'll be happy to assist.

In your letter, you asked us to complete and return a 1099c. Please rest assured that we do not need to complete this form in order for you to meet your obligations under the contract.

We appreciate the opportunity address your concerns. If you have additional questions about your account, please feel free to contact 1-800-634-1506.

Respectfully Yours,

Credit Acceptance

# EXHIBIT "K"

**1st Notice**

**2nd Opportunity to cure**

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com

OFFICIAL USE

Certified Mail Fee $4.35

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $0.00
☐ Return Receipt (electronic) $0.00
☐ Certified Mail Restricted Delivery $0.00
☐ Adult Signature Required $0.00
☐ Adult Signature Restricted Delivery

Postage $2.31

Total Postage and Fees $6.66

11/14/2023

Sent To **Credit Acceptance - CPO**

Street and Apt. No., or PO Box No.

City, State, ZIP+4

---

**2nd Notice**

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com

OFFICIAL USE

Certified Mail Fee $4.35

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $0.00
☐ Return Receipt (electronic) $0.00
☐ Certified Mail Restricted Delivery $0.00
☐ Adult Signature Required $0.00
☐ Adult Signature Restricted Delivery $0.00

Postmark Here

Postage $1.59

Total Postage and Fees $5.94

10/06/2023

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4

PS Form 3800, April 2015

4th
Notice
Default to Indenture Trustee

**Registered No.** RE217282796US

**Date Stamp**

| | | |
|---|---|---|
| Postage $ $2.31 | Extra Services & Fees *(continued)* | |
| Extra Services & Fees | ☐ Signature Confirmation $ | |
| ☐ Registered Mail $ $13.80 | ☐ Signature Confirmation Restricted Delivery $ | |
| ☐ Return Receipt *(hardcopy)* $ $0. | | |
| ☐ Return Receipt *(electronic)* $ $0. | **Total Postage & Fees** | |
| ☐ Restricted Delivery $ $0.00 | $ $19.1 | |
| Customer Must Declare Full Value $ 38,000.65 | Received by 01/11/2024 | Domestic Insurance up to $50,000 is included based upon the declared value. International Indemnity is limited. (See Reverse). |

**OFFICIAL USE**

FROM: X JSHERRILLHWFIE, IN TRUST
1499 MLK DR.
Gary, IN 46401

TO: Tracy M. McLamb / Scott Olmsted
Computershare Trust Co., N.A.
250 Royall Street
Canton MA 02021

PS Form **3806**, Registered Mail Receipt
April 2015, PSN 7530-02-000-9051
For domestic delivery information, visit our website at www.usps.com®
Copy 1 - Customer
(See Information on Reverse)

---

4th
Notice
Default to Credit Acceptance

**Registered No.** RF523054120US

**Date Stamp**

| | | |
|---|---|---|
| Postage $ $2.55 | Extra Services & Fees *(continued)* | |
| Extra Services & Fees | ☐ Signature Confirmation $ | |
| ☐ Registered Mail $ $13.80 | ☐ Signature Confirmation Restricted Delivery $ | |
| ☐ Return Receipt *(hardcopy)* $ $0.00 | | |
| ☐ Return Receipt *(electronic)* $ $0.00 | **Total Postage & Fees** | |
| ☐ Restricted Delivery $ $0.00 | $ $19.15 | |
| Customer Must Declare Full Value $ 38,000.65 | Received by 01/11/2024 | Domestic Insurance up to $50,000 is included based upon the declared value. International Indemnity is limited. (See Reverse). |

**OFFICIAL USE** USPS

Rejected
By Credit Acceptance

FROM: X JSHERRILLHWFIE, IN TRUST
1499 MLK Dr.
Gary, IN 46401

TO: Jay D. Martin
CREDIT ID: ACCEPTANCE CORP.
25505 West 12 Mile RD
Southfield MI 48034

PS Form **3806**, Registered Mail Receipt
April 2015, PSN 7530-02-000-9051
For domestic delivery information, visit our website at www.usps.com®
Copy 1 - Customer
(See Information on Reverse)

# USPS Tracking®

Tracking      FAQs >

Track Packages Anytime, Anywhere

Get the free Informed Delivery® feature to receive automated notifications on your packages

Learn More

Tracking Number:

## RF523054120US

Copy    Add to Informed Delivery

Remove ✕

### Latest Update

Your item arrived at the SOUTHFIELD, MI 48037 post office at 8:26 pm on January 18, 2024 and is ready for pickup. Your item may be picked up at SOUTHFIELD, 22200 W 11 MILE RD, SOUTHFIELD, MI 480379998, M-F 0900-1900; SAT 0900-1700.

### Available for Pickup

**Available for Pickup**
SOUTHFIELD
22200 W 11 MILE RD
SOUTHFIELD MI 48037-9998
M-F 0900-1900; SAT 0900-1700
January 18, 2024, 8:26 pm

**Available for Pickup**
SOUTHFIELD
22200 W 11 MILE RD
SOUTHFIELD MI 48037-9998
M-F 0900-1900; SAT 0900-1700
January 18, 2024, 8:24 pm

**Delivered to Agent for Final Delivery**
SOUTHFIELD, MI 48037
January 18, 2024, 9:13 am

**Arrived at Post Office**
SOUTHFIELD, MI 48037
January 18, 2024, 9:04 am

**Processing at USPS Facility**
DETROIT, MI 48233
January 16, 2024, 11:45 pm

**In Transit to Next Facility**
January 16, 2024

**Arrived at USPS Regional Destination Facility**
DETROIT MI DISTRIBUTION CENTER
January 14, 2024, 12:53 am

**Processing at USPS Facility**
CHICAGO, IL 60899
January 13, 2024, 5:08 am

**Arrived at USPS Regional Facility**
CHICAGO IL DISTRIBUTION CENTER
January 12, 2024, 8:09 am

**Processing at USPS Facility**
BEDFORD PARK, IL 60499
January 12, 2024, 2:15 am

**Arrived at USPS Regional Origin Facility**
BEDFORD PARK IL DISTRIBUTION CENTER
January 12, 2024, 2:07 am

**Departed Post Office**
MERRILLVILLE, IN 46410
January 11, 2024, 7:19 pm

**USPS in possession of item**
MERRILLVILLE, IN 46410
January 11, 2024, 6:10 pm

Hide Tracking History

What Do USPS Tracking Statuses Mean?

*Rejection By Credit Acceptance*

Copy of Default

Rejection Sent

back to Credit Acceptance

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*Domestic Mail Only*

For delivery information visit our website at www.usps.com

Southfield MI 48034

OFFICIAL USE

| Certified Mail Fee | $4.40 | | 0401 |
| $ | | | 99 |
| Extra Services & Fees (check box, add fee as appropriate) | | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | | |
| ☐ Return Receipt (electronic) | $ $0.00 | | Postmark |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | | Here |
| ☐ Adult Signature Required | $ $0.00 | | |
| ☐ Adult Signature Restricted Delivery | $ $0.00 | | |
| Postage | $2.60 | | |
| $ | | | 02/07/2024 |
| Total Postage and Fees | | | |
| $ $4.00 | | | |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7017 0530 0001 1340 8484

## USPS Tracking®     FAQs >

Tracking Number:     Remove ✕

**70212720000209751997**

Copy     Add to Informed Delivery

### Latest Update

Your item has been delivered to an agent for final delivery in SOUTHFIELD, MI 48037 on October 10, 2023 at 9:00 am.

Get More Out of USPS Tracking:

USPS Tracking Plus®

**Delivered to Agent**
Delivered to Agent for Final Delivery
SOUTHFIELD, MI 48037
October 10, 2023, 9:00 am

## USPS Tracking®     FAQs >

Tracking Number:     Remove ✕

**70203160000197430241**

Copy     Add to Informed Delivery

### Latest Update

Your item has been delivered to an agent for final delivery in SOUTHFIELD, MI 48037 on November 17, 2023 at 4:08 am.

Get More Out of USPS Tracking:

USPS Tracking Plus®

**Delivered to Agent**
Delivered to Agent for Final Delivery
SOUTHFIELD, MI 48037
November 17, 2023, 4:08 am



## USPS Tracking®     FAQs >

Tracking Number:     Remove ✕

**RE763232402US**

Copy     Add to Informed Delivery

### Latest Update

Your item has been delivered to an agent for final delivery in SOUTHFIELD, MI 48037 on September 22, 2023 at 9:44 am.

**Delivered to Agent**
Delivered to Agent for Final Delivery
SOUTHFIELD, MI 48037
September 22, 2023, 9:44 am

*All Delivered to Credit Acceptance Corp.*



4th Default Notice Delivered to trustee

*Copy of Default Rejection Redelivery to Credit Acceptance* (handwritten, left margin)

**USPS.COM**

English   Locations   Support   Informed Delivery   Register / Sign In

Quick Tools   Send   Receive   Shop   Business   International   Help

ALERT: SEVERE WEATHER CONDITIONS ACROSS THE U.S. MAY DELAY FINAL DELIVERY OF YOUR MAIL AND PACKAGES. READ MORE >

## USPS Tracking®

Tracking        FAQs >

Track Packages
Anytime, Anywhere

Get the free Informed Delivery® feature to receive automated notifications on your packages    Learn More >

Tracking Number:                                    Remove ✕

**70170530000113408484**

📋 Copy    ✕ Add to Informed Delivery

### Latest Update

Your item was delivered to an individual at the address at 1:27 pm on February 10, 2024 in SOUTHFIELD, MI 48037.

☑ **Delivered**
**Delivered, Left with Individual**
SOUTHFIELD, MI 48037
February 10, 2024, 1:27 pm

See All Tracking History

**Get More Out of USPS Tracking:**
🔔 USPS Tracking Plus®

What Do USPS Tracking Statuses Mean?

Text & Email Updates                    ⌄

USPS Tracking Plus®                      ⌄

Product Information                      ⌄

See Less ⌃

**Track Another Package**

Enter tracking or barcode numbers                    🔍

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

**USPS.COM**

HELPFUL LINKS        ON ABOUT.USPS.COM     OTHER USPS SITES           LEGAL INFORMATION
Contact Us           About USPS Home        Business Customer Gateway   Privacy Policy
Site Index           Newsroom               Postal Inspectors           Terms of Use
FAQs                 USPS Service Updates   Inspector General           FOIA
Feedback             Forms & Publications   Postal Explorer             No FEAR Act/EEO Contacts
                     Government Services    National Postal Museum      Fair Chance Act
USPS JOBS                                   Resources for Developers    Accessibility Statement
Careers                                     PostalPro

Copyright © 2024 USPS. All Rights Reserved.

# EXHIBIT "L"

 **Office of the Comptroller of the Currency**

February 12, 2024

Xavier J. Smith
1499 MLK DR., STE 64527
GARY, IN  46401

Re:  Case # CS0310602 - CREDIT ACCEPTANCE CORPORATION

Dear Xavier J. Smith:

This letter acknowledges receipt of your complaint in the Customer Assistance Group (CAG) of the Office of the Comptroller of the Currency (OCC).

Your complaint involves a financial company that does not fall under the direct jurisdiction of our office.  Therefore, we are referring your letter to the appropriate supervisory agency, which is the Consumer Financial Protection Bureau (CFPB).  Their address is:

> Consumer Financial Protection Bureau
> PO Box 27170
> Washington, DC 20038

Their toll-free phone number is (855) 411-2372, TTY/TDD: (855) 729-2372, available 8 a.m. to 8 p.m. ET, Monday through Friday.  Their Internet address is www.consumerfinance.gov.  Please direct all future correspondence regarding this issue to that office.

Sincerely,

*Customer Assistance Group*

**Office of the Comptroller of Currency**
**Complaint Submitted February 9 ,2024**

On September 18TH, 2023 I notified Credit Acceptance Corporation that I accept all rights, titles, interest, and equity owed to the principal. I included the following documents within this notice: an endorsed bill of exchange for account number 98785263, a tender of payment titled, "Letter of instruction", a copy of the durable power of attorney for XAVIER JAMAL SMITH, a copy of Federal Reserve Act Section 16 with paragraphs 1 and 2 highlighted and Section 29, and the Birth Certificate for XAVIER JAMAL SMITH. This notice was sent via Registered mail. The packet of documents arrived on September 22nd, 2023. Credit Acceptance Corporation responded with a letter dated September 28, 2023, stating, "I see that you have enclosed a Payment Coupon along with your letter. While we appreciate your efforts to make payments to your account, these documents do not constitute valid forms of payment".

On October 6th, 2023, I notified Credit Acceptance Corporation a second time that I accept all rights, titles, interest, and equity owed to the principal. The second notice included the following documents: a copy of the original endorsed bill of exchange for account number 98785263, a notarized tender of payment titled, "Notice of Claim of Credit", a copy of the durable power of attorney for XAVIER JAMAL SMITH, a copy of Federal Reserve Act Section 16, Federal Reserve Act Section 29, and a copy of the registered mail receipt for the first notice that was delivered on September 22, 2023. The second notice was sent via certified mail with a notarized Certificate of Service. The packet of documents arrived on October 10th, 2023. Credit Acceptance did not respond or perform.

On November 14th, 2023 I notified Credit Acceptance Corporation a third time that I accept all rights, titles, interest, and equity owed to the principal. The third notice included the following documents: a copy of the original endorsed bill of exchange for account number 98785263, a notarized tender of payment titled, "Notice of Default and Opportunity to Cure', a copy of the durable power of attorney for XAVIER JAMAL SMITH, a copy of Federal Reserve Act Section 16, Federal Reserve Act Section 29, and copies of the registered and certified mail receipts for the first and second notice that was delivered on September 22, 2023 and October 10th, 2023. The third notice was sent via certified mail with a notarized Certificate of Service. The packet of documents arrived on November 17th, 2023. Credit Acceptance Corporation responded with a letter dated November 22nd, 2023, stating, "I see that you have enclosed a Payment Coupon along with your letter. While we appreciate your efforts to make payments to your account, these documents do not constitute valid forms of payment".

On January 11th, 2024, I notified Credit Acceptance Corporation and their Indenture Trustee, Computershare Trust Company, National Association a fourth time that I accept all rights, titles, interest, and equity owed to the principal. The fourth notice included the following documents: an endorsed bill of exchange for account number 98785263, a notarized tender of payment titled, "Notice of Default", a recorded certified copy of the durable power of attorney

1 of 2

for XAVIER JAMAL SMITH, a copy of Federal Reserve Act Section 16, Federal Reserve Act Section 29, and copies of the registered and certified mail receipts for the first, second, and third notice that were delivered on September 22, 2023, October 10th, 2023, November 17th, 2023. The fourth notice was sent via registered Mail with a notarized Certificate of Service. The packet of documents arrived on January 17, 2024 to the Indenture Trustee and arrived and rejected on January 18, 2024 to and by Credit Acceptance Corporation. Per Federal Reserve Act section 29 (e) I am now making a complaint to the Comptroller of Currency because this is securities fraud and breach of contract. Credit Acceptance Corporation acted with dishonor, failed to perform fiduciary duties, and is not allowing me my right to utilize my securities. I was only able to attach the notices, the endorsed bill of exchange, and the certified mail receipts due to the large size of the files. Please email me if the rest of the documents are needed.

By: Smith, Xavier-jamal /agent
Attorney-in-fact for
XAVIER JAMAL SMITH /principal

2 of 2

# EXHIBIT "M"

# *BLOOMBERG AUTO LOAN ANALYSIS REPORT*<sup>TM</sup>

*Prepared for:*

## *XAVIER SMITH*

*For Goods Described as:*

*Used 2016 Chevrolet Camaro VIN# 1G1FB1RS0G0171297*

*Prepared on:*

*February 02, 2024*

# SECTION 1:    TRANSACTION DETAILS

| BUYER |
|---|
| **XAVIER SMITH** |

| BUYER ADDRESS | DESCRIPTION OF GOODS |
|---|---|
| **7300 HENDRICKS STREET, MERRILLVILLE, IN 46410** | **USED 2016 CHEVROLET CAMARO VIN# 1G1FB1RS0G0171297** |

## TRANSACTION PARTICIPANTS

| AMOUNT FINANCED | SERVICER | SELLER/CREDITOR |
|---|---|---|
| **$21,676.80** | **CREDIT ACCEPTANCE CORPORATION** | **NORTHWEST INDIANA AUTO FINANCE INC**<br><br>**401 W US HWY 6, VALPARAISO, IN 46385** |

| SELLER/CREDITOR | AGREEMENT TYPE | CASH PRICE |
|---|---|---|
| **NORTHWEST INDIANA AUTO FINANCE INC** | **66 payments of $581.47 @ 22.99% APR Retail Installment Contract** | 1)Cash Price with Sales Tax: **$22,937.80** Total Down Payment: $2,700.00 Unpaid Balance: $20,237.80 2)Extended Warranty, Auto Finance  $1,439.00 **Total Amount Financed: $21,676.80** |

## COPY OF AGREEMENT PROVIDED BY THE BUYER

### RETAIL INSTALLMENT CONTRACT

ACCOUNT # 98785263

LOT # A02G

| Buyer Name and Address | Co-Buyer Name and Address | Creditor-Seller Name and Address |
|---|---|---|
| XAVIER SMITH<br>7300 HENDRICKS ST<br>MERRILLVILLE, IN 46410 | N/A | NORTHWEST INDIANA AUTO<br>FINANCE INC<br>401 W US HWY 6<br>VALPARAISO, IN 46385 |

"You" and "Your" mean each Buyer above, jointly and severally. "Us" and "We" mean Creditor-Seller and Creditor-Seller's assignee. You may buy the Vehicle described below for cash or credit. The cash price is shown on Page 2 as the "Cash Price". The credit price is shown below as "Total Sale Price". You have agreed to buy the Vehicle from Us on credit for the Total Sale Price. You acknowledge delivery and acceptance of the Vehicle in good condition and repair. You promise to pay Us all amounts due under this Retail Installment Contract ("Contract"), including the Total Sale Price, in accordance with the payment schedule shown in the Truth in Lending Disclosures below. You also agree to the terms and conditions below (including the Truth in Lending Disclosures) and on the additional pages of this Contract. The Annual Percentage Rate may be negotiable with Us.

| | Year and Make | Model and Body Style | Color | Vehicle Identification Number | Odometer Reading |
|---|---|---|---|---|---|
| Used | 2016 Chevrolet | Camaro | GREY | 1G1FB1RS0G0171297 | 86,063 |

### TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of Your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost You. | Amount Financed<br>The amount of credit provided to You or on Your behalf. | Total of Payments<br>The amount You will have paid after You have made all payments as scheduled. | Total Sale Price<br>The total cost of Your purchase on credit, including Your down payment of |
|---|---|---|---|---|
| 22.99 % | $ 16,700.22 | $ 21,676.80 | $ 38,377.02 | $ 2,700.00 is<br>$ 41,077.02 |

**Payment Schedule:** Your payment schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ | |
| | $ | |
| 66 | $ 581.47 | Monthly, beginning June 13, 2020 |

**Security:** You are giving a security interest in the goods or Vehicle being purchased.
**Late Charge:** If a payment is more than 10 days late, You will be charged $17.50. The late charge dollar amount is subject to change as allowed by Indiana Code § 24-4.5-1-106.
**Prepayment:** If you pay early, You may be entitled to a refund of part of the Finance Charge.
**Additional Information:** Please read this Contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGES CAUSED TO OTHERS IS NOT INCLUDED.

PROPERTY INSURANCE: You must insure the Vehicle securing this Contract. YOU MAY PURCHASE OR PROVIDE THE INSURANCE THROUGH ANYONE YOU CHOOSE WHO IS REASONABLY ACCEPTABLE TO US, as more fully described on page 3.

ARBITRATION: This Contract contains an Arbitration Clause that states You and We may elect to resolve any dispute by arbitration and not by court action. See the Arbitration Clause on Page 5 of this contract for the full terms and conditions of the agreement to arbitrate. By initialing below, you confirm that you have read, understand and agree to the terms and conditions in the Arbitration Clause.

➤ Buyer's Initials  *XS*

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

USED CAR BUYERS GUIDE. THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

ADDITIONAL TERMS AND CONDITIONS: THE ADDITIONAL TERMS AND CONDITIONS, INCLUDING THE AGREEMENT TO ARBITRATE SET FORTH ON THE ADDITIONAL PAGES OF THIS CONTRACT ARE A PART OF THIS CONTRACT AND ARE INCORPORATED HEREIN BY REFERENCE.

INDIANA CREDIT ACEPTANCE CORPORATION (11-16)
© 2012-2016 Credit Acceptance Corporation.
All Rights Reserved.

PAGE 1 of 5

➤ Buyer's Initials  *XS*

Buyer's Initials _____

## ITEMIZATION OF AMOUNT FINANCED

| | | | | | |
|---|---|---|---|---|---|
| 1 | **Cash Price** (including accessories and improvements to the Vehicle) | | | $ 21,591.00 | (1) |
| 2 | **Sales Tax** | | | $ 1,346.80 | (2) |
| 3 | Down-Payment Calculation: | Cash Down Payment | $ 200.00 (A) | | |
| | | Deferred Down Payment | $ N/A (B) | | |
| | Trade-In Description: | Gross Trade-In | $ 2,500.00 (C) | | |
| | Make: CADILAC | | | | |
| | Model: DEVILLE | Payoff Made by Seller $ 0.00 (D) | | | |
| | Net Trade-In (If negative number, insert '0' in line 3(E) and itemize difference in 5(E) below) (C-D) $ 2,500.00 (E) | | | | |
| | Trade-In Description: | Gross Trade-In | $ N/A (F) | | |
| | Make: N/A | | | | |
| | Model: N/A | Payoff Made by Seller $ N/A (G) | | | |
| | Net Trade-In (If negative number, insert '0' in line 3(H) and itemize difference in 5(K) below) (F-G) $ N/A (H) | | | | |
| | Other: Manufacturers Rebate | | $ N/A (I) | | |
| | | **Total Down Payment** | (A+B+E+H+I) | $ 2,700.00 | (3) |
| 4 | **Unpaid Balance of Cash Price** (1+2 less 3) | | | $ 20,237.80 | (4) |
| 5 | Other Charges Including Amounts Paid to Others on Your Behalf: | | | | |
| | *(NOTICE: A portion of these charges may be paid to or retained by Us.) | | | | |
| | A. *Cost of Required Physical Damage Insurance Paid to Insurance Company | | $ N/A | (A) | |
| | B. *Cost of Optional Extended Warranty or Service Contract Paid to the Company named below | | $ 1,275.00 | (B) | |
| | C. Cost of Fees Paid to Public Officials for Perfecting, Releasing or Satisfying a Security Interest | | $ N/A | (C) | |
| | D. Cost of Fees Paid to Public Officials for Certificate of Title, License and Registration | | $ 15.00 | (D) | |
| | Other Charges (Seller must identify who will receive payment and describe purpose) | | | | |
| | E. to N/A for lien or lease payoff | | $ N/A | (E) | |
| | F. *to N/A for Optional GAP Protection | | $ N/A | (F) | |
| | G. *to THE SELLER for northwest indiana auto finance | | $ 149.00 | (G) | |
| | H. *to N/A for N/A | | $ N/A | (H) | |
| | I. *to N/A for N/A | | $ N/A | (I) | |
| | J. *to N/A for N/A | | $ N/A | (J) | |
| | K. to N/A for lien or lease payoff | | $ N/A | (K) | |
| | Total of Other Charges and Amounts Paid to Others on Your Behalf | | | $ 1,439.00 | (5) |
| 6 | Less Prepaid Finance Charge | | | $ N/A | (6) |
| 7 | **Amount Financed - Unpaid Balance** (4 + 5 less 6) | | | $ 21,676.80 | (7) |

**OPTIONAL EXTENDED WARRANTY OR SERVICE CONTRACT:** Although You are not required to purchase an optional extended warranty or service contract as a condition of purchasing this Vehicle on credit, by signing below, You are indicating that You want to purchase an optional extended warranty or service contract covering the repair of certain mechanical breakdowns, and that You authorize Us to purchase it. Refer to the optional extended warranty or service contract for details about coverage and duration.

Price $ 1,275.00  Term: 24 Mos.\ 24000 Miles  Company: Wynn's Extended Care, Inc.

> *Xavier Smith*     05/13/2020
Buyer's Signature     Date        Buyer's Signature     Date

**GAP PROTECTION:** Optional Guaranteed Auto Protection (GAP) is not required for You to obtain credit. GAP protection will not be provided under this Contract unless You sign it below and agree to pay the additional cost shown below and on Line 5F of the ITEMIZATION OF AMOUNT FINANCED. You may obtain optional GAP protection from a person of Your choice that is authorized to sell such coverage and is acceptable to Us. The GAP contract issued by the provider of the protection will describe the terms and conditions of coverage in further detail. If You want GAP protection, sign below.

Cost $ N/A     Term: N/A     Provider: N/A

****NOT PURCHASED - DO NOT SIGN****
Buyer's Signature     Date        Buyer's Signature     Date

**NOTICE TO BUYER:** 1. Do not sign this Contract in blank. 2. You are entitled to 1 true copy of the Contract You sign without charge. 3. Keep it to protect your legal rights.

You agree to the terms of this Contract and acknowledge that You have received a copy of this Contract with all blanks filled in and that You have read it and understand it.

> Buyer's Signature: x *Xavier Smith*     Buyer's Signature: x

Seller: NORTHWEST INDIANA AUTO FINANCE INC    By *Kassem El samad*    Title: AGENT

This Contract is signed by the Seller and Buyer(s) hereto this 13th day of May 2020

INDIANA CREDIT ACCEPTANCE CORPORATION (11-16)
© 2012-2016 Credit Acceptance Corporation.
All Rights Reserved.        PAGE 2 of 5

# SECTION 2: SECURITISATION PARTICIPANTS

| SELLER/CREDITOR | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| NORTHWEST INDIANA AUTO FINANCE INC | CREDIT ACCEPTANCE FUNDING LLC | NOT AVAILABLE |
| ISSUING ENTITY | NOTE TRUSTEE/ SECURITY TRUSTEE | SERVICER |
| CREDIT ACCEPTANCE AUTO LOAN TRUST 2020-2 | WELLS FARGO BANK N.A. | CREDIT ACCEPTANCE CORP. |
| PAYING AGENT (role includes holding of Transaction Documents) | ISSUE DATE | MATURITY DATE |
| WELLS FARGO BANK N.A. | JULY 23, 2020 | 20 JUNE 2024 |

**Presale:**

**Credit Acceptance Auto Loan Trust 2020-2**

**July 10, 2020**

## Profile

Expected closing date July 23, 2020.

Collateral Nonrecourse loans to dealers secured by subprime automobile installment sales contracts (dealer advances) and subprime automobile installment sales contracts (purchased loans).

Originator and servicer Credit Acceptance Corp. (BB/Negative/--), a Michigan corporation.

Seller Credit Acceptance Funding LLC 2020-2, a Delaware limited liability company whose sole member is Credit Acceptance Corp.

Issuer Credit Acceptance Auto Loan Trust 2020-2.

Indenture trustee, trust collateral agent, and backup servicer

Wells Fargo Bank N.A. (A+/Stable/A-1).

Owner trustee U.S. Bank Trust N.A.

Initial purchasers Wells Fargo Securities LLC, BMO Capital Markets Corp., Credit Suisse Securities (USA) LLC, Fifth Third Securities Inc., and Citizens Capital Markets Inc.

## Rationale

The preliminary ratings assigned to Credit Acceptance Auto Loan Trust 2020-2's (CAALT 2020-2) asset-backed notes reflect: - The availability of approximately 62.1%, 54.7% and 50.4% credit support for the class A, B, and C notes, respectively, which is based on stressed cash flow scenarios, including excess spread, in respect of the installment sales contracts. These provide coverage of more than 2.7x, 2.4x, and 2.2x our 22.75%-23.25% expected cumulative net loss range, as a percentage of the performing retail installment sales contracts, for the class A, B, and C notes, respectively. The credit support levels are commensurate with the assigned preliminary 'AAA (sf)', 'AA (sf)', and 'A (sf)' ratings on the class A, B, and C notes, respectively (see the S&P Global Ratings' Auto Loan Expected Loss and Cash Flow Modeling sections for more information).

Changes From The Series 2020-1 Transaction

The credit enhancement, collateral composition, and structural changes from the last rated series, 2020-1, are detailed below. In our view, these changes are not material and we did not adjust our expected cumulative net loss or ratings-specific stressed loss levels based on the changes.

**Transaction Overview**

CAALT 2020-2 is CAC's second securitization in 2020, its 26th stand-alone securitization since 2008, and its 30th S&P Global Ratings credit-rated term securitization. The first series 2020-2 distribution will be made on Aug. 17, 2020, and subsequent distributions will be paid on the 15th day of each month or the next business day. The class A, B, and C notes total $384.6 million. Each class will be paid a fixed interest rate and receive principal sequentially as described in the Payment Structure section below.

**Transaction Structure**



Copyright © 2020 by Standard & Poor's Financial Services LLC. All rights reserved.

In evaluating the credit quality of the securitized assets, we applied our "General Methodology And Assumptions For Rating U.S. Auto Loan Securitizations" criteria, published Jan. 11, 2011. Because the installment sales contracts backing the dealer advance portion of the collateral are pledged by the dealers to CAC (as opposed to being sold), we have applied dealer default assumptions to reflect the risk (regardless of how remote) of an automatic stay of these contracts' proceeds in the event of a dealer bankruptcy. (See the S&P Global Ratings' Auto Loan Expected Loss section below for further discussion of our auto loan and dealer default assumptions.)

Transaction Structure

The series 2020-2 transaction incorporates the following structural features:

- A 24-month revolving period, during which CAC will add collateral, as needed, to maintain the requisite enhancement levels.

- A revolving period that may terminate before it is scheduled to end if certain trigger events occur, at which point, early amortization would begin.

- A full turbo sequential payment structure across the rated notes at the start of the amortization period, which is scheduled to begin at the close of business on the July 2022 distribution date; however, it is subject to early amortization if a trigger event occurs.

- An initial O/C of 20% of the NBV that should build quickly during the amortization period because of the full turbo structure.

- A reserve account that will be funded with an initial deposit of 2% of the initial note balance. The reserve account is nondeclining throughout the deal's life.

- Approximately 66% of the initial NBV consists of dealer advances that were originated under CAC's portfolio program. The remaining 34% consists of the purchase price of the purchased loans (see the Business Model section below for more information on these programs).

- The installment sales contracts securing the dealer advances are pledged by the dealers to CAC (as opposed to being sold). Therefore, our analysis also reflects our view of the risk, however remote, that cash flows from certain installment sales contracts could be delayed by an automatic stay if a dealer, whose advances are included in the securitized pool, becomes bankrupt. We assumed a certain number of bankrupt dealers at each rating category (see the S&P Global Ratings' Auto Loan Expected Loss section below).

As noted above, the full turbo structure causes O/C as a percentage of the NBV to grow quickly once a securitized pool begins to amortize. Table 2 shows the O/C levels of those deals for which data are available at various times during the first six months of amortization, as a percentage of the initial NBV. Of the series listed, 2017-2 through 2018-2 are currently in their amortization period. The more recent transactions, series 2018-3 through 2020-1, are still in their revolving periods

**Securitization Note Factors**



Copyright © 2020 by Standard & Poor's Financial Services LLC. All rights reserved.

Trigger events
Some of the performance triggers that will cause the revolving period to end and the amortization period to begin include:

- The adjusted collateral amount, namely the dealer advances and purchased loan collateral, and any amounts on deposit in the principal collections account cannot be less than the amount required to ensure at least 20% O/C for two or more business days.

- The component of the adjusted collateral amount that consists of a deposit in the principal collections account cannot exceed 5% of the adjusted collateral amount for two or more business days.

- Cumulative collections for any three consecutive periods must equal at least 90% of the cumulative forecast collections.

- The weighted average spread rate must be at least 25.00%. It is calculated as the ratio of the weighted average percentage that is not originally advanced (i.e., one minus the weighted average original advance rate) to the pool's weighted average forecast collection rate. As stated above, the series 2020-2 pool's percentage-based spread is 29.90%.

Portfolio program/dealer advances The portfolio program is the older of the two programs and the company's central focus. Under this program, CAC makes loans directly to dealers who are members of its dealer network. These dealer advances, which are securitized, are made in connection with the dealers' origination of installment sales contracts that obligors enter into to purchase vehicles on the

Page | 10

dealers' lots. The installment sales contracts secure the dealer advances and are pledged by the dealers to CAC. The company services those contracts and transfers its secured rights in, and the cash flows from, the contracts to the securitization trust via the seller. The installment sales contract cash flows are used to repay the dealer advances. The portfolio program currently accounts for approximately 66% (as a percentage of NBV) of the series 2020-2 initial pool.

Generally, in the portfolio program, each payment received under the installment sales contracts is applied in the following priority:

- Pay CAC a finance charge that is 20% of the monthly collections for servicing the contracts.

- Repay the advance CAC made to the dealer.

- When the advance is paid in full, pay any remaining amounts to the dealer.

Loan purchase program

In March 2005, CAC introduced the newest version of its loan purchase program, whereby it purchases contracts directly from dealers. This program provides incremental volume and accommodates dealers that do not want to participate in the portfolio program, subject to eligibility requirements. Each monthly payment under the installment sales contract belongs to CAC to cover the contract's purchase price that it paid to the dealer and to pay its finance charge.

This program has grown as a percentage of the company's business over the last several quarters. Increasing penetration among large predominantly franchised dealerships, which tend to prefer the purchase loan program, has contributed to an increase in the average amount paid relative to larger, newer, more expensive vehicles purchased over longer terms of up to 72 months.

The NBV of an identified pool of advances is securitized in these transactions, along with the company's rights in the installment sales contracts associated with those advances. Chart 4 shows the losses on the advances by annual vintage over the past 11 years. The highest loss occurred in 2015 and is currently forecast to be 1.41%.



**Credit Acceptance Corp. Collection Rates, Advance Rates, And Spread(i)**

(i)As of May 31, 2020. (ii)Applicable to 2019-1 and later series.

Copyright © 2020 by Standard & Poor's Financial Services LLC. All rights reserved.

To the extent that regulatory authorities allow a rating agency to acknowledge in one jurisdiction a rating issued in another jurisdiction for certain regulatory purposes, S&P reserves the right to assign, withdraw or suspend such acknowledgment at any time and in its sole discretion. S&P Parties disclaim any duty whatsoever arising out of the assignment, withdrawal or suspension of an acknowledgment as well as any liability for any damage alleged to have been suffered on account thereof.

https://www.spglobal.com/_assets/documents/ratings/research/11559523.pdf

# SECTION 3:    FORECLOSURE

**Recorded Events on the Loan Including Foreclosure Issues and Securitization**

| Recorded Chain of Agreement Possession | | Chain of Note Possession | |
|---|---|---|---|
| Date | Original Agreement | Date | Note Holder |
| May 13, 2020<br>Official Records,<br>Lake County<br>Indiana | XAVIER SMITH<br>(Buyer)<br><br>NORTHWEST INDIANA AUTO<br>FINANCE INC<br>(Seller/Creditor) | May 13, 2020 | NORTHWEST INDIANA AUTO<br>FINANCE INC<br>(Seller/Creditor)<br><br>Principal Amount:<br>$21,676.80 |
| Official Records,<br>Lake County<br>Indiana | **No Assignment of Agreement is<br>available at the time of this report.** | July 23, 2020 | Credit Acceptance Auto Loan<br>Trust 2020-2<br>Issuing Entity<br><br>Principal Amount:<br>$21,676.80 |

*Note: The above analysis covers primary active loan.*

# REPORT SUMMARY

**Agreement:**

- On May 13, 2020, Debtors XAVIER SMITH executed a negotiable promissory note and a security interest in the form of a Agreement in the amount of $21,676.80. This document was filed as document number dndt in the Official Records of Lake County. *The original Seller/Creditor of the promissory note and beneficiary of the Mortgage is NORTHWEST INDIANA AUTO FINANCE INC.*

**Securitization (The Note):**

- The NOTE based on the researched performed was sold, transferred, assigned and securitized into the **CREDIT ACCEPTANCE AUTO LOAN TRUST 2020-2** with a Closing Date of July 23, 2020.

## BLOOMBERG SEARCH SECTION

On **February 02, 2024**, a researched of the Bloomberg online Database was performed at the request of **XAVIER SMITH** whose Description of Goods is noted herein above. The Agreement search was conducted using Bloomberg's terminal based on the Original Amount: **$21,676.80**; Origination Date: on or after **May 13, 2020**; Description of Goods: **Used 2016 Chevrolet Camaro VIN# 1G1FB1RS0G0171297**; Examiner did, however, locate a prospective securitization that matches the characteristics for the possibility of securitizing this Agreement. This trust is described as the CREDIT ACCEPTANCE AUTO LOAN TRUST 2020-2. The Seller and Servicer is Credit Acceptance Funding LLC.

Other possibilities for the location of this instrument are in the portfolio of loans held in inventory or for sale by NORTHWEST INDIANA AUTO FINANCE INC. While the NORTHWEST INDIANA AUTO FINANCE INC originated the instrument, they or a subsequent purchaser may not have recorded their interest in the instrument or to a buyer pursuant to the requirements of stte8 Commercial Law, the Statute of Frauds and any equivalents of the Indiana Uniform Commercial Code.

NORTHWEST INDIANA AUTO FINANCE INC or other affiliates may also have placed the instrument into a private placement securitization exempt from SEC or other public reporting requirements and which was not reported to Bloomberg, LP; or for which NORTHWEST INDIANA AUTO FINANCE INC or other affiliates used as secured borrowings to raise additional funds.

**Identification of exact NORTHWEST INDIANA AUTO FINANCE INC or other corporate portfolio may be gotten through a Qualified Written Request, a Request for Information under Regulations X or Z, voluntary lender disclosure, a Freedom of Information Act request as applicable, or discovery through litigation.**

Screen shots of this trust from the Bloomberg System follow:

## SECURITY DESCRIPTION FROM BLOOMBERG

**This is a private placement stated to be subject to rule 144(a) of the Securities Act of 1933, restricted to non-US investors, unless otherwise qualified.**



## SECURITY DESCRIPTION
### Group Summary



## SECURITY DESCRIPTION
### Original Collateral Characteristics and Restrictions.



Screen saved as C:\Users\patron\Desktop\CAALT 2020-2\DES 2.png

CAALT 2020-2A A Mtge    Send                                    Page 3/3  Security Description

US AUTO          21.332(82)38   CUSIP 22535MAA7   RepLines   P5 Buy   N) Sell

1) Bond Summary    2) Group Summary    3) Comments

ORIGINAL COLLATERAL CHARACTERISTICS

TYPE: Dealer Loans, Purchased Loans and Contracts.

PRICED

Issue Price per Bloomberg News. Story on CN.

RESTRICTIONS: Rule 144A eligible

THESE SECURITIES WILL NOT BE AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED OR SOLD
IN THE UNITED STATES ABSENT REGISTRATION OR AN APPLICABLE EXEMPTION FROM REGISTRATION REQUIREMENTS.

1 2 9777 8600 Brazil 5511 2395 9000 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 85
4565 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2024 Bloomberg F
SN 455411 EST  GMT-5:00 G375-4342-172 30-Jan-2024 10:48:56

**RATINGS HISTORY**
**Shows Issue Date and Maturity Date**

CAALT 2020-2A A   Paid Off              Yiel --/--              --
As of--        Prepay-      WAL--   Collateral00.0% AUTO21.3%
CAALT 2020-2A A Mtge      Setup Alert    Settings ·                              Ratings History

CUSIP  22535MAA7   Coupon 1.370   Issue Date     07/23/2020
CMO   SEQ                         Maturity Date  07/16/2029

| Agency | Rating Type | Rating | Effective Date |
|--------|-------------|--------|----------------|
| Moody's | Long Term | WR | 08/02/2023 |
| S&P | Long Term | NR | 06/28/2023 |
| S&P | Long Term | AAA | 07/23/2020 |
| Moody's | Long Term | Aaa | 07/23/2020 |
| Moody's | Long Term | (P)Aaa | 07/10/2020 |

Upgrade  Downgrade  Affirmation  Initial  Recent Rating Action
:1 2 9777 8600 Brazil 5511 2395 9000 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852
4565 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2024 Bloomberg F
                        SN 455411 EST  GMT-5:00 G375-4342-172 30-Jan-2024 10:49:28

## STRUCTURED FINANCE NOTES
### Shows the list to the Securitization Participants

CAALT 2020-2A A  Paid Off          Yield --/--         --
As of --  Prepay --  WAL --  Collateral 100.0% AUTO21.3%

Documents ·                                                    Structured Finance Notes

CAALT 2020-2A CREDIT ACCEPTANCE AUTO LOAN TRUST
Underwriter
Lead Manager      BMO Capital Markets
Lead Manager      Credit Suisse NA
Lead Manager      Wells Fargo Securities LLC
Co-Manager        Citizens Capital Markets

Original Servicers                       Trustee
Master   Credit Acceptance               Wells Fargo Bank
Backup   Wells Fargo Bank NA
                                         Paying Agent

Originator/Seller            Deal%       Asset Manager
Credit Acceptance Corporation  100
                                         Swap Counterparty

Insurer                      Deal%

1 2 9777 8600 Brazil 5511 2395 9000 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 85
4565 8900      Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2024 Bloomberg F
                                SN 455411 EST  GMT-5:00 G375-4342-172 30-Jan-2024 10:49:05

**YIELD TABLE**
**Structure Paydown**



## VIEW ALL LOAN CLASSES SCREEN
This screen shows the splitting of the investment classes (first 30 out of 33 classes shown)
**Fidelity Investment Search Result for CUSIP# 22535NAA7 (is shown below)**



**FIDELITY INVESTMENT SEARCH RESULT FOR CUSIP# 22535NAA7**
**Shows it's an Investment Bond actively being Traded (as of 2/2/2024)**

**Fidelity** CUSTOMER SERVICE | PROFILE | OPEN AN ACCOUNT | VIRTUAL ASSISTANT | LOG OUT      🔍 Search or get a quote

| Accounts & Trade | Planning & Advice | News & Research | Products | Why Fidelity |
|---|---|---|---|---|

Trade    Welcome to the new Fixed Income Trading Experience. ⬤

**Account**

Select an Account...    ⌄

| Cusip | CREDIT ACCEP AUT LN SER 2020-2 CL A 1.37000% 07/15/2029 TR 2020-2 BOND 144A | | | |
|---|---|---|---|---|
| 22535MAA7 | **Ask Price** | **Ask Yield** | **Ask Quantity(min)** | **Third Party Price** |
|  | -- | -- | --(--) | -- |

# CREDIT ACCEP AUT LN SER 2020-2 CL A
1.37000% 07/15/2029 TR 2020-2 BOND 144A

**Overview**    **Price & Performance**

## Details

| | | |
|---|---|
| CUSIP | 22535MAA7 |
| ISIN | US22535MAA71 |
| SEDOL | -- |
| Pay Frequency | MONTHLY |
| Coupon | 1.370 |
| Maturity Date | 07/15/2029 |
| Moody's Rating | WR |
| S&P Rating | NR |
| Issuer Events | NO |
| Survivor Option | N/A |
| Bond Type | Corporate |
| Sector | N/A |
| Interest Accrual Date | 07/23/2020 |

## Redemptive Features

| | |
|---|---|
| Call Protection | View Schedule NO |
| Continuously Callable | NO |
| Called Bonds | NO |
| Make Whole Call | NO |
| Conditional Call | NO |
| Sinking Fund Protection | YES |

## Issuer Information

| | |
|---|---|
| Issue Date | 07/23/2020 |
| Dated Date | 07/23/2020 |
| First Coupon Date | 08/15/2020 |
| Next Coupon | 02/15/2024 |
| Last Coupon | -- |
| Workout Date | 07/15/2029 |
| Original Issue Amount | $326,900,000.00 |
| Issue Price | -- |

## Coupon Information

| | |
|---|---|
| Coupon Type | FIXED |
| Current Rate Effective Date | 09/08/2020 |
| Day Count Basis | 30/360 |
| Trading Flat | NO |
| Reset Frequency | TERM MODE |
| Benchmark Reference | -- |
| Benchmark Formula | -- |
| Next Reset Date | -- |
| Next Reset Rate | -- |
| Minimum Rate | -- |
| Maximum Rate | -- |

https://fixedincome.fidelity.com/ftgw/fi/FIBondDetails?cusip=22535MAA7

## CONCLUSION

## CHAIN OF TITLE



**ARROW LEGEND**

PURPLE – AGREEMENT DOCUMENTS
BLUE – SECURITIES CERTIFICATES
RED – INVESTOR FUNDS
GREEN – BUYER FUNDS

(The selling or transferring of the Note is not to be confused with the selling of Servicing Rights, which is simply the right to collect payment on the Note, and keep a small portion of the payment for Servicing Fees. Usually, when a homeowner states that their loan was sold, they are referring to Servicing Rights.)

ξ Securitizing a Loan

Securitizing a loan is the process of selling a loan to Wall Street and private investors. it is a method with many issues to be considered. The methodology of securitizing a loan generally followed these steps:

- A Wall Street firm would approach other entities about issuing a "Series of Bonds" for sale to investors and would come to an agreement. In other words, the Wall Street firm "pre-sold" the bonds.

- The Wall Street firm would approach a lender and usually offer them a warehouse Line of Credit. The Warehouse Credit Line would be used to fund the loan. The Warehouse Line would be covered by restrictions resulting from the initial Pooling & Servicing Agreement Guidelines and Mortgage Loan Purchase Agreement. These documents outlined the procedures for the creation of the loans and the administering of the loans prior to, and after, the sale of the loans to Wall Street.

- The Seller/Creditor, with the guidelines, essentially went out and found "buyers" for the loans, people who fit the general characteristics of the Purchase Agreement. (Guidelines were very general and most people could qualify." The Seller/Creditor would execute the loan and fund it, collecting payments until there were enough loans funded to sell to the Wall Street firm who could then issue the bonds.

- Once the necessary loans were funded, the Seller/Creditor would then sell the loans to the "Sponsor", usually either a subsidiary of the Wall Street firm, of a specially created Corporation of the Seller/Creditor. At this point, the loans are separated into "tranches" of loans, where they will be eventually turned into bonds.

- Next, the loans were "sold" to the "Depositor." This was a "Special Purpose Vehicle" designed with one purpose in mind. That was to create a "bankruptcy remote vehicle" where the Seller/Creditor or other entities are protected from what might happen to the loans, and/or the loans are "protected" from the Seller/Creditor. The "Depositor" would be, once again, created by the Wall Street firm or the Seller/Creditor.

- Then the "Depositor" would place the loans into the Issuing Entity, which is another entity created solely for the purpose of selling the bonds.

- Finally, the bonds would be sold, with a Trustee appointed to ensure that the bondholders received their monthly payments.

ξ NORTHWEST INDIANA AUTO FINANCE INC was a "correspondent Seller/Creditor" that originated Agreement loans. These loans, in turn, were sold and transferred into a "federally-approved securitization" trust named the CREDIT ACCEPTANCE AUTO LOAN TRUST 2020-2.

ξ The Note and Deed have taken two distinctly different paths. The Note was securitized into the CREDIT ACCEPTANCE AUTO LOAN TRUST 2020-2.

ξ The Agreement was originally made to NORTHWEST INDIANA AUTO FINANCE INC and was sold and transferred to CREDIT ACCEPTANCE AUTO LOAN TRUST 2020-2. There is no record of Assignments to either the Sponsor or Depositor as required by the Prospectus Agreement.

Page | 26

**Exhibit I**

## COPY OF AGREEMENT PROVIDED BY THE BUYER

**RETAIL INSTALLMENT CONTRACT**

ACCOUNT # 98785263                                      LOT # A02G

| Buyer Name and Address | Co-Buyer Name and Address | Creditor-Seller Name and Address |
|---|---|---|
| XAVIER SMITH<br>7300 HENDRICKS ST<br>MERRILLVILLE, IN 46410 | N/A | NORTHWEST INDIANA AUTO<br>FINANCE INC<br>401 W US HWY 6<br>VALPARAISO, IN 46385 |

"You" and "Your" mean each Buyer above, jointly and severally. "Us" and "We" mean Creditor-Seller and Creditor-Seller's assignee. You may buy the Vehicle described below for cash or credit. The cash price is shown on Page 2 as the "Cash Price". The credit price is shown below as "Total Sale Price". You have agreed to buy the Vehicle from Us on credit for the Total Sale Price. You acknowledge delivery and acceptance of the Vehicle in good condition and repair. You promise to pay Us all amounts due under this Retail Installment Contract ("Contract"), including the Total Sale Price, in accordance with the payment schedule shown in the Truth in Lending Disclosures below. You also agree to the terms and conditions below (including the Truth in Lending Disclosures) and on the additional pages of this Contract. The Annual Percentage Rate may be negotiable with Us.

| | Year and Make | Model and Body Style | Color | Vehicle Identification Number | Odometer Reading |
|---|---|---|---|---|---|
| Used | 2016 Chevrolet | Camaro | GREY | 1G1FB1RS0G0171297 | 86,063 |

### TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of Your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost You. | Amount Financed<br>The amount of credit provided to You or on Your behalf. | Total of Payments<br>The amount You will have paid after You have made all payments as scheduled. | Total Sale Price<br>The total cost of Your purchase on credit including Your down payment of $ 2,700.00 is |
|---|---|---|---|---|
| 22.99 % | $ 16,700.22 | $ 21,676.80 | $ 38,377.02 | $ 41,077.02 |

**Payment Schedule:** Your payment schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ | |
| | $ | |
| 66 | $ 581.47 | Monthly, beginning  June 13, 2020 |

**Security:** You are giving a security interest in the goods or Vehicle being purchased.
**Late Charge:** If a payment is more than 10 days late. You will be charged $17.50. The late charge dollar amount is subject to change as allowed by Indiana Code § 24-4.5-1-106.
**Prepayment:** If You pay early, You may be entitled to a refund of part of the Finance Charge.
**Additional Information:** Please read this Contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

**LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGES CAUSED TO OTHERS IS NOT INCLUDED.**

**PROPERTY INSURANCE:** You must insure the Vehicle securing this Contract. YOU MAY PURCHASE OR PROVIDE THE INSURANCE THROUGH ANYONE YOU CHOOSE WHO IS REASONABLY ACCEPTABLE TO US, as more fully described on page 3.

**ARBITRATION:** This Contract contains an Arbitration Clause that states You and We may elect to resolve any dispute by arbitration and not by court action. See the Arbitration Clause on Page 5 of this contract for the full terms and conditions of the agreement to arbitrate. By initialing below, you confirm that you have read, understand and agree to the terms and conditions in the Arbitration Clause.

Buyer's Initials  _XS_              Buyer's Initials _____

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

USED CAR BUYERS GUIDE. THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

**ADDITIONAL TERMS AND CONDITIONS:** THE ADDITIONAL TERMS AND CONDITIONS, INCLUDING THE **AGREEMENT TO ARBITRATE** SET FORTH ON THE ADDITIONAL PAGES OF THIS CONTRACT ARE A PART OF THIS CONTRACT AND ARE INCORPORATED HEREIN BY REFERENCE.

Buyer's Initials  _XS_

INDIANA CREDIT ACCEPTANCE CORPORATION (11-16)
© 2012-2016 Credit Acceptance Corporation.
All Rights Reserved.                                  PAGE 1 of 5                        Buyer's Initials _____

## ITEMIZATION OF AMOUNT FINANCED

1 **Cash Price** (including accessories and improvements to the Vehicle) ............................................ $ 21,591.00 (1)
2 Sales Tax ................................................................................................................................. $ 1,346.80 (2)
3 Down-Payment Calculation: Cash Down Payment ...................................... $ 200.00 (A)
   Deferred Down Payment .............................. $ N/A (B)
   Trade-In Description: Gross Trade-In ....... $ 2,500.00 (C)
   Make: CADILAC
   Model: DEVILLE  Payoff Made by Seller $ 0.00 (D)
   Net Trade-In (if negative number, insert '0' in line 3(E) and itemize difference in 5(E) below) (C-D) $ 2,500.00 (E)
   Trade-In Description: Gross Trade-In ....... $ N/A (F)
   Make: N/A
   Model: N/A  Payoff Made by Seller $ N/A (G)
   Net Trade-In (if negative number, insert '0' in line 3(H) and itemize difference in 5(K) below) (F-G) $ N/A (H)
   Other: Manufacturers Rebate .......................................................................... $ N/A (I)
   **Total Down Payment** ...................................................... (A+B+E+H+I) $ 2,700.00 (3)
4 **Unpaid Balance of Cash Price** (1+ 2 less 3) ...................................................................... $ 20,237.80 (4)
5 Other Charges Including Amounts Paid to Others on Your Behalf:
   *(NOTICE: A portion of these charges may be paid to or retained by Us.)
   A. *Cost of Required Physical Damage Insurance Paid to Insurance Company ................ $ N/A (A)
   B. *Cost of Optional Extended Warranty or Service Contract Paid to the Company named below $ 1,275.00 (B)
   C. Cost of Fees Paid to Public Officials for Perfecting, Releasing or Satisfying a Security Interest $ N/A (C)
   D. Cost of Fees Paid to Public Officials for Certificate of Title, License and Registration .... $ 15.00 (D)
   Other Charges (Seller must identify who will receive payment and describe purpose)
   E. to N/A for lien or lease payoff ................................... $ N/A (E)
   F. *to N/A for Optional GAP Protection .......................... $ N/A (F)
   G. *to THE SELLER for nothwest indiana auto finance $ 149.00 (G)
   H. *to N/A for N/A $ N/A (H)
   I. *to N/A for N/A $ N/A (I)
   J. *to N/A for N/A $ N/A (J)
   K. to N/A for lien or lease payoff ................................. $ N/A (K)
   Total of Other Charges and Amounts Paid to Others on Your Behalf ................................ $ 1,439.00 (5)
6 Less Prepaid Finance Charge ................................................................................................ $ N/A (6)
7 **Amount Financed - Unpaid Balance** (4 + 5 less 6) ............................................................ $ 21,676.80 (7)

**OPTIONAL EXTENDED WARRANTY OR SERVICE CONTRACT:** Although You are not required to purchase an optional extended warranty or service contract as a condition of purchasing this Vehicle on credit, by signing below and/or initialing and indicating that You voluntarily elect to buy an optional extended warranty or service contract covering the repair of certain mechanical breakdowns of the Vehicle and/or its components and features. Refer to the optional extended warranty or service contract for details about coverage and duration.

Price $ 1,275.00  Term: 24 Mos.\ 24000 Miles  Company: Wynn's Extended Care, Inc.

> _Xavier Smith_                    05/13/2020
Buyer's Signature        Date        Buyer's Signature        Date

**GAP PROTECTION: Optional Guaranteed Auto Protection (GAP) is not required to obtain credit.** GAP protection will not be provided under this Contract unless You sign for it below and agree to pay the additional cost shown below and on Line 5F of the ITEMIZATION OF AMOUNT FINANCED. You may obtain optional GAP protection from a person of Your choice that is authorized to sell such coverage and is acceptable to Us. The GAP contract issued by the provider of the protection will describe the terms and conditions of coverage in further detail. If You want GAP protection, sign below.

Cost: $ N/A  Term: N/A  Provider: N/A

****NOT PURCHASED - DO NOT SIGN****
Buyer's Signature        Date        Buyer's Signature        Date

***NOTICE TO BUYER: 1. Do not sign this Contract in blank. 2. You are entitled to 1 true copy of the Contract you sign without charge. 3. Keep it to protect your legal rights.***

**You agree to the terms of this Contract and acknowledge that You have received a copy of this Contract with all blanks filled in and that You have read it and understand it.**

> Buyer's Signature: x  _Xavier Smith_        Buyer's Signature: x
Seller: NORTHWEST INDIANA AUTO FINANCE INC  By: _Kassem El samad_  Title: AGENT
This Contract is signed by the Seller and Buyer(s) hereto this 13th day of May 2020

INDIANA CREDIT ACCEPTANCE CORPORATION (11-16)
© 2012-2016 Credit Acceptance Corporation.
All Rights Reserved.                    PAGE 2 of 5

Page | 28

## SELLER ASSIGNS ITS INTEREST TO CREDIT ACCEPTANCE CORPORATION

**Collection Costs.** If We hire an attorney to collect what You owe and the attorney is not our salaried employee, You will pay the attorney's reasonable fee and any reasonable expenses We incur in realizing on the security interest.

**Delay in Enforcing Rights and Changes of this Contract.** We can delay or refrain from enforcing any of our rights under this Contract without losing them. For example, We can extend the time for making some payments without extending others. Any change in the terms of this Contract must be in writing and signed by Us. No oral changes are binding. If any part of this Contract is not valid, all other parts will remain enforceable.

**Interest After Maturity.** You further agree to pay interest at the Annual Percentage Rate stated on page 1 of this Contract or at the highest rate permitted by applicable law, on any amounts that remain unpaid after maturity of this Contract. For the purposes of this provision, maturity means the earlier of the date Your final payment is due or the date We accelerate the Contract.

**Judgment Rate.** Interest on any judgment awarded on this Contract will be at 8% or at the highest rate permitted by applicable law.

**Governing Law.** The terms of this Contract are governed by the law of the state of the Seller's address shown on page 1 of this Contract, except to the extent preempted by applicable federal law.

### ASSIGNMENT

FOR VALUE RECEIVED, Seller hereby assigns and transfers all Seller's right, title and interest in and to this Contract, and in and to the Vehicle described herein, to CREDIT ACCEPTANCE CORPORATION ("Assignee"), its successors and assigns, pursuant to and in accordance with the terms and conditions set forth in the existing dealer agreement between Seller and Assignee in effect on the date hereof. Seller gives Assignee full power, either in Assignee's name or in Seller's name, to take all actions which Seller could have taken under this Contract. In order to induce Assignee to accept assignment of this Contract, Seller represents and warrants to Assignee as set forth in the existing dealer agreement.

**NOTICE OF ASSIGNMENT:** The Seller has assigned this Contract to Credit Acceptance Corporation in accordance with the terms and conditions set forth below on this Contract. This assignment is without recourse. You must make all future payments to: **CREDIT ACCEPTANCE CORPORATION, 25505 WEST TWELVE MILE ROAD-SUITE 3000, SOUTHFIELD, MICHIGAN 48034-8339, 1-(800)-634-1506.**

Seller: NORTHWEST INDIANA AUTO FINANCE INC    By: *Kassem El samad*    Title: AGENT

Buyer's Initials: 7S

Buyer's Initials: _____

INDIANA CREDIT ACCEPTANCE CORPORATION (11-16)
© 2012-2016 Credit Acceptance Corporation.
All Rights Reserved.                    PAGE 4 of 5

The original retail installment contract is assigned to Credit Acceptance Corporation.

Title information data source: Document provided by the Buyer

1. XAVIER SMITH acquired an Agreement on May 13, 2020 in the amount of $21,676.80 for Used 2016 Chevrolet Camaro VIN# 1G1FB1RS0G0171297.

# EXHIBIT "N"

# Auto Loan Debt Audit

for

# Xavier Smith

7300 Hendricks Street, Merrillville IN 46410

## Purposes of the Examination

The purposes of this examination are as follows:

- The QWR and QWR Response. To establish the facts that a Qualified Written Request has been sent to the loan servicer on a certain date prior to this examination and that the servicer has responded to it on a certain date and to determine the disputations and requests for information that were manifested by the borrower in the request and the manner and extent to which they were handled and covered by the servicer in its response.

- The Loan and the Security. To establish the existence of the loan and the underlying security as agreed upon and acknowledged by the parties based on the documents presented, to identify the mortgaged property and to determine their terms and conditions. The documents are reviewed in order to determine if the lender complied with the disclosures required under the TILA and the RESPA. The debt-to-income ratio of the borrower and the loan-to-value ratio of the property are also computed in order to determine if these are within prescribed limits or if there are indications of predatory lending practices. This section also touches on the status and issues regarding loan servicing.

2

## The Documents Presented for Examination

The documents that were presented and which were considered in this examination are enumerated and described below. Sufficient effort has been exerted in obtaining these documents in order to ensure that they are complete and reflect the true state of the loan and the underlying security as of the date of examination. The examiner has added additional documents to support his findings and these are accordingly described as such.

Where, in spite of these efforts some documents could not be obtained, the examiner may not be able to attain the purpose or purposes of the examination for which these documents could have been made the bases, and thus, the examination will not cover these phases and no conclusion could be arrived at for them.

The examiner warrants that these documents were in the same state when they were examined as when they first came into his possession. In spite of the deficiencies as may be noted herein, the documents are treated as true and correct copies of their originals.

The documents are herein listed as exhibits, as follows:

   Auto Loan Document

3

# The Debt & the Security Instruments

## The Promissory Note

### Promissory Note

A promissory note is a written promise to pay a debt. It is an unconditional promise to pay on demand or at a fixed or determined future time a particular sum of money to or to the order of a specified person or to the bearer. Promissory Notes, Law and Legal Definition, Retrieved August 25, 2014, from http://definitions.uslegal.com/p/promissory-notes/

### Parties in a Promissory Note

The parties in a promissory note are basically the maker and the payee. The maker is person who makes the note and undertakes to pay the amount stated in the promissory note. The payee is the person to whom the amount is payable under the promissory note.

Subsequent parties, if any, are the holder, the endorser, and the endorsee. The holder is the person who may be the payee or endorsee of the promissory note. The holder is the person who is entitled to possession of the instrument in his own name and is also entitled to receive the amount due under the promissory note. The endorser is the person who, by endorsement, transfers the promissory note to another person. The endorsee is the person to whom the promissory note is transferred by endorsement. Parties to Promissory Notes, Bills, & Checks, Retrieved August 25, 2014, from http://www.myedupages.com/all-topics/89-banking-laws-practices/parties-to-promissory-notes-bills-and-cheques/162-parties-to-promissory-notes-bills-and-cheques

### Endorsement

Endorsement is the act of the owner or payee signing his/her name on the back of a check, bill of exchange or other negotiable instrument so as to make it payable to another or cashable by another person.

An endorsement in blank is also known as general endorsement. It specifies no particular endorsee and thereafter is payable to bearer and may be negotiated by

4

delivery alone. An endorsement in blank is an unqualified endorsement, and thus the endorser thereof makes all warranties to all subsequent holders in due course specified in Section 3-417, Uniform Commercial Code. Endorsement, Law and Legal Definition, Retrieved & *abridged*, August 25, 2014, from http://definitions.uslegal.com/e/endorsement/

Promissory Note, Governing Law

In the United States, the law governing negotiable instruments in general and promissory notes in particular is Article 3 of the Uniform Commercial Code. UCC Article 3 – Negotiable Instruments, Legal Information Institute, Retrieved August 25, 2014, from http://www.law.cornell.edu/ucc/3

5

## Information on the Debt & the Security Instruments

| General | Car Loan | $ 21,676.80 |
|---|---|---|
| | Date Granted | May 13, 2020 |

6

## Parties in the Debt & the Security Instruments

| Borrower | Name | Xavier Smith |
|---|---|---|
| | Mailing Address | 7300 Hendricks Street, Merrillville IN 46410 |
| | | |
| Lender | Name | Northwest Indiana Auto Finance Inc. |

7

## About the Servicer

### Loan Servicer

A loan servicer is a financial institution which reports loan payments, collects monthly payments and penalties on late payment, releases liens, makes certain that insurance and taxes are paid and initiates foreclosure proceedings for loans in default. A loan servicer is also called a mortgage servicer. A loan servicer can also be the lender who owns the loan. Loan Servicer Law & Legal Definition, Retrieved August 25, 2014 from http://definitions.uslegal.com/l/loan-servicer/

8

Examiner's Comments

The Promissory Note/Loan Contract

The subject loan exists according to the amount, interest rate, maturity date and the terms and conditions stated in the promissory note which is assumed to have been signed by the borrower. It could not be ascertained if this note has been endorsed.

The promissory note, the parties thereto and its terms and conditions fell within the cited definitions, as applicable, and is considered to be governed under the applicable laws.

9

## The Sequence of Transactions

The sequence of the required and the actual transactions pertaining to the subject loan and security instruments can be traced as follows:

| Seq. No. | Date | Debt Instrument | Security Instrument |
|----------|------|-----------------|---------------------|
| 1 | Payments Begin on 5/13/2020 | Loan Granting Xavier Smith, Borrower Northwest Indiana Auto Finance Inc., Originating Lender | Loan Contract |

10

The Sequence of Transactions, Explained

1. Loan Granting and Execution of Deed

The auto loan is for the amount of $ 21,676.80 with the lender being Northwest Indiana Auto Finance Inc.

## Examiners' Comments

The Auto Loan Lender company needs to abide by the lending laws which govern credit. The debt validity argument below says that if a debt cannot be validated, there can be no collection of it. Thus they must validate the debt, in order to collect payments on the debt. See below.

Debt Validity Argument + Additional Arguments

Debt Collection Validity
-    If a debt cannot be validated, there can be no collection of it. This
is established by 15 USC 1692g(b).
-    Disputed Debts a debt collector
must cease collection of the debt until it is validated.

18 U.S. Code § 241 - Conspiracy against rights

Additional Argument:
"Where there are no depositions, admissions, or affidavits the court has no facts to rely on for a summary determination."

Trinsey v. Pagliaro, D.C. Pa. 1964, 229 F. Supp. 647.

12

Debt Validity Argument + Additional Arguments

Debt Collection Validity
-    If a debt cannot be validated, there can be no collection of it. This
is established by 15 USC 1692g(b).
-    Disputed Debts a debt collector
must cease collection of the debt until it is validated.

18 U.S. Code § 241 - Conspiracy against rights

Additional Argument:
"Where there are no depositions, admissions, or affidavits the court
has no facts to rely on for a summary determination."

Trinsey v. Pagliaro, D.C. Pa. 1964, 229 F. Supp. 647.

The National Bank Act of 1864, Section 28, "Such
associations shall not purchase or hold real estate in any other case
or for any other purpose than as specified in this section. Nor shall
it hold possession of any real estate under mortgage, or hold the
title and possession of any real estate purchased to secure any debts
due to it for a longer period than five years."

**Law Analysis/Citation:**
The trial court has confirmed it.  Now the appellee's brief confirms it. There is no legal
precedent for this case to be on the Judicial Branch website. None has been cited, appellant
has found no such precedent in Connecticut or for that matter in the United States. And this
Court agrees...15 months ago.  JP Morgan Chase Bank, N.A. vs. Virgulak, 192 Conn.App.
688 (2019). And if appellant is mistaken, he is in great company, because neither the trial
court nor the plaintiff, nor the Appellate Court has been able to cite a case --- a holding.
This Court agrees with appellant and with a holding:
The plaintiff has cited no authority, and we have found none, that stands for the proposition
that...a court can foreclose a mortgage that purports to secure a nonexistent debt. Id., supra
at 705.
Case Citation
JP Morgan Chase Bank vs Dirgulak. Case Citation: 218A.3d

13

CASE
Boucher v. Fin. Sys. of Green Bay, 880 F.3d 362

In Boucher v. Fin. Sys. of Green Bay, a debt collector sent a Wisconsin borrower a notice that closely tracked safe harbor language that 7th Circuit had previously ruled to comply with the FDCPA—except for one thing. The debt collector's notice indicated that the Wisconsin borrower may be liable for "late charges and other charges." The borrower sued the debt collector under the FDCPA asserting that the "late charges and other charges" language in the notice violated the statute. The debt collector countered that its notice tracked the safer harbor language and the notice could not violate the FDCPA as a matter of law.

Basing its decision in part on Wisconsin law, the 7th Circuit found the debt collector's notice was misleading to an unsophisticated consumer particularly given that Wisconsin law does not allow a debt collector to recover late charges and other charges. Accordingly, the 7th Circuit agreed with the borrower that the notice was confusing to the unsophisticated consumer.

In addition to limiting the value of "safe harbor" language, the 7th Circuit cautioned lower courts against dismissing FDCPA claims based upon deceptive notices. That is because the 7th Circuit suggests that "district court judges are not good proxies for the 'unsophisticated consumer' whose interest the [FDCPA] protects."

https://caselaw.findlaw.com/us-7th-circuit/1886136.html

Saccameno v. U.S. Bank National

Around 2009, Saccameno defaulted on her mortgage. U.S. Bank began foreclosure proceedings. She began a Chapter 13 bankruptcy plan under which she was to cure her default over 42 months while maintaining her monthly mortgage payments, 11 U.S.C. 1322(b)(5). In 2011, Ocwen acquired her previous servicer. Ocwen, inexplicably, informed her that she owed $16,000 immediately. Saccameno continued making payments based on her plan. Her statements continued to fluctuate. In 2013, the bankruptcy court issued a notice that Saccameno had completed her payments. Ocwen never responded; the court entered a discharge order. Within days an Ocwen employee mistakenly treated the discharge as a dismissal and reactivated the foreclosure. For about two years, Saccameno and her attorney faxed her documents many times and spoke to many Ocwen employees. The foreclosure protocol remained open. Ocewen eventually began rejecting her payments. Saccameno sued, citing breach of contract; the Fair Debt Collection Practices Act; the Real Estate Settlement Procedures Act; and the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFDBPA), citing consent decrees that Ocwen previously had entered with

14

regulatory bodies, concerning inadequate recordkeeping, misapplication of payments, and poor customer service. The jury awarded $500,000 for the breach of contract, FDCPA, and RESPA claims, plus, under ICFDBPA, $12,000 in economic, $70,000 in non-economic, and $3,000,000 in punitive damages. The Seventh Circuit remanded. While the jury was within its rights to punish Ocwen, the amount of the award is excessive.

https://law.justia.com/cases/federal/appellate-courts/ca7/19-1569/19-1569-2019-11-27.html

15

# UCC Section 3-301

**UCC Section 3-301** provides only three ways in which an individual may qualify as the person eligible to enforce a note, two of which require the person to be in possession of the note (which may include possession by a third party that possesses it for the person) 19 : • The first way a person may qualify as the person eligible to enforce a note will be its "holder." This familiar concept, put down in more detail in UCC Section 1-201(b)(21)(A), requires that the person be in possession of the note and either (i) the note is payable to that person or (ii) the note is payable to bearer. Determining to whom a note is payable requires examination not only of the face area of the note but additionally of any indorsements. This is because the party to whom a note is payable may be changed by indorsement20 to ensure that, for instance, a note payable to the order of a named payee that's indorsed in blank by that payee becomes payable to bearer.21

• The 2nd way a person may be the person eligible to enforce a note will be a "Non-holder in possession of the [note] who has the rights of a holder." o Just how can an individual who is not the holder of a note have the rights of a holder?. This may occur by operation of law beyond your UCC, such as the law of subrogation or estate administration, by what type person may be the successor to or acquires another person's rights.22. Additionally it may occur if the delivery of the note to that person is really a "transfer" (as that term is defined in UCC Section 3-203, see below) because transfer of a note "vests in the transferee any right of the transferor to enforce the instrument."23 Thus, in case a holder (who, as seen above, is really a person eligible to enforce a note) transfers the note to another person, that other person (the transferee) obtains from the holder the right to enforce the note even though the transferee does not end up being the holder (as in the example below). Similarly, a 19 See UCC § 1-103(b) (unless displaced by particular provisions of the UCC, the law of, *inter alia*, principal and agent supplements the provisions of the UCC). See also UCC § 3-420, Comment 1 ("Delivery to an agent [of a payee] is delivery to the payee."). Note that

"delivery" of a negotiable instrument is defined in UCC § 1-201(b)(15) as voluntary transfer of possession. This Report does not address the determination of whether a particular person is an agent of another person under the law of agency and the agency law implications of such a determination.

20 "Indorsement," as defined in UCC § 3-204(a), requires the signature of the indorser. The law of agency determines whether a signature made by a person purporting to act as a representative binds the represented person. UCC § 3-402(a); see note 12, supra. An indorsement may appear either on the instrument or on a separate piece of paper (usually referred to as an *allonge*) affixed to the instrument. See UCC § 3-204(a) and Comment 1, par. 4.

21 UCC Section 3-205 contains the rules concerning the effect of various types of indorsement on the party to whom a note is payable. Either a "special indorsement" (see UCC § 3-205(a)) or a "blank indorsement" (see UCC § 3205(b)) can change the identity of the person to whom the note is payable. A special indorsement is an indorsement that identifies the person to whom it makes the note payable, while a blank indorsement is an indorsement that does not identify such a person and results in the instrument becoming payable to bearer. When an instrument is indorsed in blank (and, thus, is payable to bearer), it may be negotiated by transfer of possession alone until specially indorsed. UCC § 3-205(b).

22 See Official Comment to UCC § 3-301. 23 UCC § 3-203(b).

Subsequent transfer will result in the following transferee being truly a person eligible for enforce the note.

23  o Under what circumstances does delivery of a note qualify as an exchange? As mentioned in UCC Section 3-203(a), a note is transferred "if it is delivered by a person apart from its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." For instance, assume that the payee of a note sells it to an assignee, going to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee won't qualify as a holder (because the note continues to be

17

payable to the payee) but, because the transaction between the payee and the assignee qualifies as an exchange, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person eligible for enforce it. Thus, the failure to acquire the endorsement of the payee doesn't prevent a person in possession of the note from being the person eligible for enforce it, but demonstrating that status is more difficult. The reason being the person in possession of the note must also demonstrate the purpose of the delivery of the note to it to be able to qualify as the person eligible for enforce.

24  Under what circumstances does delivery of a note qualify as a transfer? As stated in UCC Section 3-203(a), a note is transferred "if it is delivered with a person apart from its issuer for the goal of giving to the person receiving delivery the right to enforce the instrument." Like, think that the payee of a note sells it to an assignee, intending to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee will not qualify as a holder (because the note is still payable to the payee) but, as the transaction between the payee and the assignee qualifies as a transfer, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the individual eligible for enforce it. Thus, the failure to obtain the endorsement of the payee doesn't prevent a person in possession of the note from being the individual eligible for enforce it, but demonstrating that status is more difficult. The reason being the individual in possession of the note must demonstrate the goal of the delivery of the note to it in order to qualify as the individual eligible for enforce.24

24 If the note was transferred for value and the transferee does not qualify as a holder because of the lack of endorsement by the transferor, "the transferee has a specifically enforceable right to the unqualified endorsement of the transferor." See UCC § 3-203(c).

25 UCC § 3-309(a)(iii) (1990 text), 3-309(a)(3) (2002 text). The 2002 text goes on to provide that a transferee from the person who lost possession of a note may also qualify as a person entitled to enforce it. See UCC § 3309(a)(1)(B) (2002). This point was thought to be implicit in the 1990 text, but was rejected in some cases in which the issue was raised. The

reasoning of those cases was rejected in Official Comment 5 to UCC § 9-109 and the point
was made explicit in the 2002 text of Article 3.

26 To prevail the person must establish not only that the person is a person entitled to
enforce the note but also the other elements of the maker's obligation to pay such a person.
See generally UCC §§ 3-309(b), 3-412. Moreover, as is the case with respect to the
enforcement of all rights under the UCC, the person enforcing the note must act in good
faith in enforcing the note. UCC § 1-304. Subsequent transfer can lead to the next transferee
being a person eligible for enforce the note.

**Illustrations:**

1.Maker issued a negotiable mortgage note payable to the order of Payee. Payee is in
possession of the note, which has not been indorsed. Payee may be the holder of the note
and, therefore, is the person eligible to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

2. Maker issued a negotiable mortgage note payable to the order of Payee. Payee indorsed
the note in blank and gave possession of it to Transferee. Transferee may be the holder of
the note and, therefore, is the person eligible to enforce it. UCC §§ 1-201(b)(21)(A), 3-
301(i).

3. Maker issued a negotiable mortgage note payable to the order of Payee. Payee sold the
note to Transferee and gave possession of it to Transferee for the objective of giving
Transferee the proper to enforce the note. Payee did not, however, indorse the note.
Transferee isn't the holder of the note because, while Transferee is in possession of the note,
it's payable neither to bearer nor to Transferee. UCC § 1-201(b)(21)(A). Nonetheless,
Transferee is really a person eligible to enforce the note. This is because the note was
transferred to Transferee and the transfer vested in Transferee Payee's to enforce the note.
UCC § 3-203(a)-(b). As a result, Transferee is really a nonholder in possession of the note
with the rights of a holder and, accordingly, a person eligible to enforce the note. UCC § 3-
301(ii).

4 Same facts as Illustrations 2 and 3, except that (i) underneath the law of agency, Agent is
the agent of Transferee for purposes of possessing the note and (ii) it is Agent, rather than

19

Transferee, to whom actual physical possession of the note is written by Payee. In the important points of Illustration 2, Transferee is just a holder of the note and a person eligible to enforce it. In the context of Illustration 3, Transferee is just a person eligible to enforce the note. Whether Agent may enforce the note or mortgage on behalf of Transferee depends partly on what the law states of agency and, in the event of the mortgage, real property law. 5. Same facts as Illustration 2, except that after obtaining possession of the note, lost the note and its whereabouts cannot be determined. Transferee is just a person eligible to enforce the note even though Transferee does not need possession of it. UCC § 3-309(a). If Transferee brings an action on the note against Maker, Transferee must establish the terms of the note and the weather of Maker's obligation on it. The court might not enter judgment and only Transferee, however, unless the court finds that Maker is adequately protected against loss that may occur by reason of a state of another person (such while the finder of the note) to enforce the note. UCC § 3-309(b). 27 See *id*. UCC § 3-309(b) goes on to state that "Adequate protection may be provided by any reasonable means."

20